By:    GERALD LAWRENCE, Esq.
E-mail: glawrence@lowey.com
Identification No. 69079
LOWEY DANNENBERG COHEN & HART, P.C.
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Phone: 610-941-2760

ASSESSMENT OF DAMAGES
HEARING

[ ] IS    [X] IS NOT REQUIRED

[X] JURY   [ ] NON JURY

Attorneys for Plaintiffs

---

BLUE CROSS BLUE SHIELD ASSOCIATION, et al.,

                             Plaintiffs,

                v.

GLAXOSMITHKLINE LLC,

                           Defendant.

PHILADELPHIA COUNTY
COURT OF COMMON PLEAS

TRIAL DIVISION

JULY TERM, 2011 NO. 1465

---

## COMPLAINT—CIVIL ACTION
### (KT - DISPUTE RE: BUSINESS TORT)

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after the complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| PHILADELPHIA BAR ASSOCIATION<br>Lawyer Referral and Information Service<br>1101 Market Street, 11th Floor<br>Philadelphia, Pennsylvania 19107<br>(215) 238-1701 | ASOCIACIÓN DE LICENCIADOS DE FILADELFIA<br>Servicio De Referencia E Información Legal<br>1101 Market Street, 11th Floor<br>Filadelfia, Pennsylvania 19107<br>(215) 238-1701 |

Filed and Attested by PROTHONOTARY 24 JUL 2013 03:55 pm P. MARTIN

By:    GERALD LAWRENCE, Esq.
E-mail: glawrence@lowey.com
Identification No. 69079
LOWEY DANNENBERG COHEN & HART, P.C.
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Phone: 610-941-2760

BLUE CROSS BLUE SHIELD
ASSOCIATION
225 North Michigan Avenue
Chicago, IL 60601,

AETNA, INC.
151 Farmington Avenue
Hartford, CT 06156,

AMERIGROUP/HMS
4425 Corporation Lane
Virginia Beach, VA 23462

AVMED HEALTH PLANS
9400 South Dadeland Boulevard
Miami, FL 33156,

BLUECROSS BLUESHIELD OF ALABAMA
450 Riverchase Parkway East
Birmingham, AL 35244,

BLUE CROSS BLUE SHIELD OF
DELAWARE
One Brandywine Gateway
800 Delaware Avenue
Wilmington, DE 19801,

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC.
4800 Deerwood Campus Parkway
Jacksonville, FL 32246,

BLUE CROSS OF IDAHO HEALTH
SERVICE, INC.
3000 E. Pine Avenue
Meridian, ID 83642,

*(caption continued on next page)*

ASSESSMENT OF DAMAGES
HEARING

[  ] IS        [X] IS NOT REQUIRED

[X] JURY   [  ] NON JURY

Attorneys for Plaintiffs

PHILADELPHIA COUNTY
COURT OF COMMON PLEAS

TRIAL DIVISION

JULY TERM, 2011 NO. 1465

BLUE CROSS AND BLUE SHIELD OF
KANSAS CITY
2301 Main
Kansas City, MO 64108

BLUE CROSS BLUE SHIELD OF
MASSACHUSETTS
401 Park Drive
Boston, MA 02215,

BLUECROSS BLUESHIELD OF
MINNESOTA
3535 Blue Cross Road
Eagan, MN 55122-1154,

BLUE CROSS BLUE SHIELD OF
MONTANA, INC.
560 North Park Avenue
Helena, MT 59604,

BLUE CROSS AND BLUE SHIELD OF
NORTH
CAROLINA
5901 Chapel Hill Road
Durham, NC 27707,

BLUE CROSS & BLUE SHIELD OF RHODE
ISLAND
500 Exchange Street
Providence, RI 02903,

BLUE CROSS AND BLUE SHIELD OF
SOUTH
CAROLINA
I-20 at Alpine Road
Columbia, SC 29219,

BLUECROSS BLUESHIELD OF
TENNESSEE
1 Cameron Hill Circle
Chattanooga, TN 37402,

*(caption continued on next page)*

Case ID: 110701465

CAREFIRST OF MARYLAND, INC. (d/b/a CAREFIRST
BLUECROSS BLUESHIELD)
1501 S. Clinton Street
Baltimore, MD 21224,

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY
900 Cottage Grove Road
Hartford, CT 06152,

EMBLEMHEALTH
55 Water Street
New York, NY 10041,

GOVERNMENT EMPLOYEES HEALTH
ASSOCIATION
310 NE Mulberry Street
Lees Summit, MO 64086-5861,

GROUP HEALTH COOPERATIVE
320 Westlake Avenue North
Seattle, WA 98109,

GROUP HOSPITALIZATION AND
MEDICAL
SERVICES, INC., d/b/a CAREFIRST
BLUECROSS BLUESHIELD
840 1st Street, NE
Washington, D.C. 20065,

HEALTH CARE SERVICES CORPORATION
300 East Randolph Street
Chicago, IL 60601,

HEALTH NET, INC.
21650 Oxnard Street
Woodland Hills, CA 91367,

*(caption continued on next page)*

HEALTHNOW NEW YORK, INC.
257 West Genesee Street
Buffalo, NY 14202,

HIGHMARK INC.
120 Fifth Avenue
Pittsburgh, PA 15222,

HIGHMARK WEST VIRGINIA INC., d/b/a
HIGHMARK BLUE CROSS BLUE SHIELD
WEST VIRGINIA
614 Market Street
Parkersburg, WV 26102,

HMO PARTNERS, INC., d/b/a HEALTH
ADVANTAGE
601 Gaines Street
Little Rock, AR 72201,

HORIZON BLUE CROSS BLUE SHIELD
OF NEW JERSEY
Three Penn Plaza East
Newark, NJ 07105,

KPS HEALTH PLANS
P.O. Box 339
Bremerton, WA 98337,

LOUISIANA HEALTH SERVICE
INDEMNITY COMPANY, d/b/a BLUE
CROSS AND BLUE SHIELD
OF LOUISIANA
5525 Reitz Avenue
Baton Rouge, Louisiana 70809,

MEDICAL MUTUAL OF OHIO (an Ohio
corporation)
2060 East 9th Street
Cleveland, OH 44115,

NORIDIAN
4510 13th Avenue South
Fargo, ND 58121,

*(caption continued on next page)*

PREMERA BLUE CROSS
7001 220th Street SW
Mountlake Terrace, WA 98043-2124,

PRIORITY HEALTH
1231 East Beltline
Grand Rapids, MI 49525,

THE REGENCE GROUP
100 Southwest Market Street
Portland, OR 97201-5702,

USABLE MUTUAL INSURANCE
COMPANY, d/b/a
ARKANSAS BLUE CROSS AND BLUE
SHIELD
601 Gaines Street
Little Rock, Arkansas 72201,

WELLCARE HEALTH PLANS, INC.
8735 Henderson Road
Tampa, FL 33634

WELLMARK HEALTH PLAN OF IOWA,
INC.
1331 Grand Avenue
Des Moines, IA 50309,

WELLMARK, INC., d/b/a WELLMARK
BLUE CROSS
AND BLUE SHIELD OF IOWA
1331 Grand Avenue
Des Moines, IA 50309, and

WELLPOINT, INC.
120 Monument Circle
Indianapolis, IN 46204,

                               Plaintiffs,

               v.

GLAXOSMITHKLINE LLC,

                               Defendant.

Case ID: 110701465

## TABLE OF CONTENTS

GLOSSARY OF TERMS ................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

RELEVANT TIME PERIOD .............................................................................................. 5

JURISDICTION AND VENUE ......................................................................................... 5

PARTIES ............................................................................................................................ 6

    Plaintiffs .................................................................................................................. 6

    Defendant GSK ...................................................................................................... 10

SB PHARMCO ................................................................................................................ 11

INDIVIDUAL PARTICIPANTS..................................................................................12

THE FDA AND cGMPs .................................................................................................. 13

OVERVIEW OF cGMP VIOLATIONS BY GSK AND SB PHARMCO.................................... 15

PLAINTIFFS' DAMAGES ............................................................................................. 16

FDA WARNING LETTER AND COVER-UP AT CIDRA ............................................ 17

    Background ............................................................................................................ 17

    GSK's Response to the FDA ................................................................................ 19

    Eckard's Termination, Report to GSK's Compliance Department and Report
    to the FDA............................................................................................................. 27

EXAMPLES OF cGMP VIOLATIONS AND QUALITY ASSURANCE FAILURES
SUPPORTING PLAINTIFFS' CLAIMS ......................................................................... 28

    Product Commingling........................................................................................... 29

    Contamination in Products Manufactured in the Sterile Facility........................ 32

    Substandard Quality and Control of Water Systems ........................................... 36

    Out of Specification ("OOS") Events for Environmental Monitoring of Manufacturing

Case ID: 110701465

Areas and Clean Equipment.................................................................................37

Laboratory Investigations ..................................................................................38

Process Validation .............................................................................................41

Equipment Calibration .......................................................................................42

Overdue Process Investigations, Including Avandamet ....................................44

Content Uniformity Failures (i.e., Super- and Sub-Potency) in Avandamet.....45

Obstruction, Understaffing and Attrition in the Quality Unit and Failure of the Quality System.................................................................................................................46

Metal and Other Foreign Particles in Drug Products........................................48

Poor Documentation Quality .............................................................................49

Destruction of Audit Reports .............................................................................50

Microbiology Laboratory ("Micro Lab")...........................................................51

Substandard Air Quality ....................................................................................51

Cytotoxic Research & Development ("R&D") Manufacturing..........................52

Other cGMP Issues ............................................................................................52

CONCLUSION.............................................................................................................53

THE ENTERPRISES......................................................................................................54

CAUSES OF ACTION ..................................................................................................57

PRAYER FOR RELIEF .................................................................................................66

DEMAND FOR JURY TRIAL ......................................................................................67

EXHIBIT A: UNITED STATES OF AMERICA v. SB PHARMCO PUERTO RICO, INC., INFORMATION FOR VIOLATION OF 21 U.S.C. §§ 331(a), 333(a)(2), AND 351(a)(2)(B) INTERSTATE SHIPMENT OF ADULTERATED DRUGS

EXHIBIT B: EXAMPLES OF DRUGS AND INTERSTATE PAYMENTS FRAUDULENTLY INDUCED BY GSK

Case ID: 110701465

# GLOSSARY OF TERMS

CFRs        Code of Federal Regulations

cGMPs       current Good Manufacturing Practices

FDA         Food and Drug Administration

FDA-483     FDA Form FD483, a list of "observations" representing violations the FDA
            believes a manufacturer has committed

GQA         Global Quality Assurance, a division of GSK

OOS         Out-of-Specification

QA          Quality Assurance

R&D         Research & Development

RTP         GSK headquarters in Research Triangle Park, North Carolina

SMIRT       Senior Management Incident Reporting Team, a senior management team
            established at Cidra in 2002

SOPs        Standard Operating Procedures

Case ID: 110701465

Plaintiffs, by their attorneys Lowey Dannenberg Cohen & Hart, P.C., Getnick & Getnick

LLP, and Prof. G. Robert Blakey, as and for their complaint, allege as follows:

## INTRODUCTION

1.      Plaintiff insurance companies are payers for pharmaceutical drugs that were

victims of an unlawful scheme perpetrated by Defendant GlaxoSmithKline LLC ("GSK" or

"Defendant"), to induce Plaintiffs to pay billions of dollars for adulterated and illegally marketed

drugs that were manufactured and distributed by GSK throughout the United States.  As the

principal payers and hence the principal targets and victims of GSK's unlawful scheme,

Plaintiffs sue GSK for violations of Pub. L. No. 91-452, 84 Stat. 922 (1970), *codified as* 18

U.S.C. §§ 1961-1968 (2006), and for violations of  the laws of the Commonwealth of

Pennsylvania, namely common law fraud, insurance fraud, breach of warranty, unjust

enrichment, and negligent misrepresentation.  Plaintiffs seek remedies of actual damages, treble

damages, punitive damages, disgorgement of gross receipts, pre-judgment and post-judgment

interest, and equity relief, including, but not limited to, appropriate injunctions as specified in

Public Law No. 91-452, and such other relief that may be in the interests of justice.

2.      Federal law requires that pharmaceutical drugs be manufactured in accordance

with current Good Manufacturing Practices ("cGMPs") to assure that they meet legal

requirements for safety, and that they have the quality, purity, identity, and strength that they are

represented to possess.  Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 351(a)(2)(B).  The

cGMPs, which are set forth in 21 CFR Parts 210 and 211 and are enforced by the Food and Drug

Administration ("FDA"), govern the manufacturing, processing, packing, and holding of

pharmaceuticals.  Under federal law, any drug that is not manufactured in accordance with

cGMPs to assure its safety, quality, purity, identity, and strength is deemed "adulterated," and

Case ID: 110701465

may not be distributed or sold in the United States. 21 U.S.C. §§ 331(a) and 351(a)(2)(B).

3.      GSK, by itself and through its predecessor SmithKline Beecham Corporation ("SmithKline Beecham"),[1] with intent to defraud, distributed and sold huge quantities of adulterated drugs in the U.S. market as part of a scheme to induce Plaintiffs to pay for those drugs over an extended period of years, starting no later than 1997 and continuing through 2006. Plaintiffs, who collectively represent approximately 70% of the U.S. market for non-governmental health insurance, paid billions of dollars for these adulterated drugs, which were manufactured at a plant in Cidra, Puerto Rico ("Cidra" or "the Cidra Plant") owned and operated by SB Pharmco Puerto Rico, Inc. ("SB Pharmco"), a wholly-owned subsidiary of GSK. The Cidra Plant was the exclusive manufacturer of many of GSK's best-selling drugs for the U.S. market. The drugs manufactured at Cidra included Paxil, Paxil OS, Avandia, Avandamet, Coreg, Bactroban, Kytril, Compazine, Denavir, Dyazide, Dibenzyline, Thorazine, Stelazine, Relafen, Factive, Dyrenium, and Albenza (hereafter referred to collectively as the "At-Issue Drugs").

4.      GSK and SB Pharmco knew that the Cidra Plant was riddled with serious, chronic, and pervasive manufacturing and quality defects that violated numerous cGMPs and undermined the integrity of every one of the Cidra Plant's operating systems and of all the drugs that were manufactured there, including the At-Issue Drugs. GSK deliberately compromised Cidra's Quality System and cut corners on every aspect of Cidra's operations, including infrastructure, equipment, and staff, in order to realize even more massive profits than GSK already enjoyed from selling products whose cost to manufacture was a tiny fraction of their selling price. GSK placed profits over compliance and quality, and those profits were achieved

---

[1]      Unless otherwise indicated, "GSK" or "Defendant" will refer to both GlaxoSmithKline LLC and its predecessor SmithKline Beecham Corporation.

Case ID: 110701465

at Plaintiffs' expense every time they paid for misrepresented drugs manufactured at Cidra.

When senior GSK officials, including some of the Individual Participants identified below, were

confronted with the serious failures in the plant's essential systems and the consequent

adulteration of the drugs manufactured there, they did not correct the problems but instead

decided to cover them up. That cover-up is nowhere more clearly manifested than in the firing

of GSK's Manager of Global Quality Assurance responsible for the Cidra Plant when she

insisted on a course of correction. Instead of rewarding the messenger for her diligence and

courage in bringing the magnitude of the problems to the attention of higher management, GSK

decided to eliminate her, as further set forth herein.

     5.     Much of GSK's wrongdoing has been admitted. In October 2010, SB Pharmco

pled guilty to the federal crime of introducing into interstate commerce, with intent to defraud

and mislead, adulterated versions of four of the drugs manufactured at the Cidra Plant,

Avandamet, Kytril, Bactroban, and Paxil CR, in violation of 21 U.S.C. §§ 331(a), 333(a)(2), and

351(a)(2)(B). *See* http://www.justice.gov/opa/pr/2010/October/10-civ-1205.html. A copy of the

Information to which SB Pharmco pled guilty is attached as Exhibit A and incorporated herein

by reference. Plaintiffs allege that the same wrongdoing that is admitted in that guilty plea

extended to all of the drugs manufactured at the Cidra Plant, including all of the At-Issue Drugs.

     6.     Plaintiffs bring this lawsuit to recover the huge sums of money they paid for the

adulterated At-Issue Drugs distributed and sold by GSK in violation of federal and state law.

GSK knowingly and with intent to defraud made express and implied misrepresentations -- in

marketing materials, advertisements, package inserts, and other public statements -- that the

drugs were manufactured in accordance with cGMPs to assure their safety and conformity with

their purported quality, purity, identity, and strength; that the drugs were safe and effective and

Case ID: 110701465

possessed those purported attributes; and that the distribution and sale of the drugs were lawful.

7.    GSK knew that those representations were false and baseless. GSK knew and fraudulently concealed the fact that there were egregious and systemic violations of cGMPs at the Cidra Plant, that the At-Issue drugs were adulterated and their distribution and sale were prohibited, and that consequently the drugs were worthless. Alternatively, GSK made those representations with reckless indifference as to whether they were true or false, or did so negligently.

8.    For example, every package of the At-Issue Drugs sold in the United States contained a printed insert that represented that every instance of the drug had the specified properties, conformed to its specified description, and carried a guarantee of quality assurance. GSK knew that those representations were false and baseless because the drugs were produced at a plant with egregious cGMP violations; that the drugs therefore were adulterated as a matter of law and could not be legally distributed or sold; and that consequently the drugs were worthless.

9.    GSK's misrepresentations and omissions were material to Plaintiffs' decisions to pay for the At-Issue Drugs, and in paying for the drugs Plaintiffs justifiably relied on those misrepresentations and omissions. Plaintiffs would not have continued paying for the drugs if they had known that the drugs were adulterated, could not lawfully be sold or distributed, and were therefore worthless. Consequently, Plaintiffs are entitled to recover the entire amounts they paid for the drugs, as well as the additional relief specified below.

10.    Plaintiffs paid the lion's share of the prices charged for the At-Issue Drugs, and consequently were the direct and primary victims of GSK's scheme to fraud. Although GSK's scheme involved deception of other parties as well -- e.g., patients, doctors, and the FDA -- Plaintiffs' claims are not dependent on other parties who also may have relied on, and may have

been deceived and damaged by, GSK's misrepresentations or omissions.  GSK's scheme could

not have achieved its objective -- to realize massive profits from the sale of drugs that were

represented to be of the highest quality but were in fact adulterated -- without Plaintiffs'

continued infusion of billions of dollars for those drugs each year into GSK's coffers.  Plaintiffs

were the biggest single source of GSK's revenues in the U.S. market from the At-Issue Drugs

and were the necessary factor in GSK's ability to charge premium prices for those drugs,

including (without limitation) the brand-name blockbusters Paxil, Avandia, and Coreg.

11.     Plaintiffs, as the principal payers and victims of GSK's scheme to defraud,

suffered damages as a direct and proximate result.

## RELEVANT TIME PERIOD

12.     The relevant time period for the purposes of this Complaint began no later than

1997 and continued through 2006.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action as a court of general

jurisdiction, pursuant to the provisions of 18 U.S.C. § 1964 and the holding of the United States

Supreme Court in *Tafflin v. Levitt*, 493 U.S. 455, 110 S. Ct. 792, 107 L. Ed. 2d. 887 (1990).  This

Court has personal jurisdiction over GSK because GSK carries on a continuous and systematic

part of its general business within the Commonwealth of Pennsylvania.  This Court may exercise

personal jurisdiction over GSK consistent with due process and under 42 Pa. Cons. Stat. §

5301(a)(2) and 42 Pa. Cons. Stat. § 5322.

14.     Venue is proper here because GSK's principal place of business is in

Philadelphia, Pennsylvania.  Venue is proper under Pa. R.C.P. 1006 and 2179.

5

## PARTIES

**Plaintiffs**

15.    BLUE CROSS BLUE SHIELD ASSOCIATION is a federation of health insurance providers with its headquarters in Chicago, Illinois.

16.    AETNA, INC. is a Pennsylvania corporation with its principal place of business in Hartford, Connecticut.

17.    AMERIGROUP/HMS is a Medicaid managed care organization with its principal place of business in Virginia Beach, Virginia.

18.    AVMED HEALTH PLANS is a not-for-profit health maintenance organization with its principal place of business in Miami, Florida. Its legal name is AvMed, Inc., d/b/a AvMed Health Plans.

19.    BLUECROSS BLUESHIELD OF ALABAMA is an Alabama not-for-profit corporation with its principal place of business in Birmingham, Alabama.

20.    BLUE CROSS BLUE SHIELD OF DELAWARE is a healthcare insurance provider that operates from Wilmington, Delaware. Its legal name is Highmark BCBSD Inc. d/b/a as Highmark Blue Cross Blue Shield Delaware.

21.    BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC. is a Florida corporation with its principal place of business in Jacksonville, Florida.

22.    BLUE CROSS OF IDAHO HEALTH SERVICE, INC. is an Idaho corporation with its principal place of business in Meridian, Idaho.

23.    BLUE CROSS AND BLUE SHIELD OF KANSAS CITY is a healthcare insurance provider with a principal place of business in Kansas City, Missouri.

24.    BLUE CROSS BLUE SHIELD OF MASSACHUSETTS is a hospital and

Case ID: 110701465

medical services corporation with a principal place of business in Boston, Massachusetts.

25.    BLUE CROSS BLUE SHIELD OF MINNESOTA is a nonprofit health care service plan corporation organized under Minnesota Statutes chap. 62C with a principal place of business in Eagan, Minnesota.  Its legal name is Blue Cross Blue Shield of Minnesota, Inc. d/b/a Blue Cross Blue Shield of Minnesota.  It is held by a holding company, Aware Integrated, Inc.

26.    BLUE CROSS BLUE SHIELD OF MONTANA, INC. is a Montana corporation with a principal place of business in Helena, Montana.

27.    BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA is  a North Carolina hospital and medical service corporation with a principal place of business in Chapel Hill, North Carolina.

28.    BLUE CROSS & BLUE SHIELD OF RHODE ISLAND is a nonprofit hospital and medical services corporation offering prepaid health insurance plans, with its principal place of business in Providence, Rhode Island.

29.    BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA is a mutual insurance company headquartered in Columbia, South Carolina.

30.    BLUECROSS BLUESHIELD OF TENNESSEE is a Tennessee corporation with its principal place of business in Chattanooga, Tennessee.

31.    CAREFIRST OF MARYLAND, INC., d/b/a CAREFIRST BLUECROSS BLUESHIELD, is a not-for-profit Maryland corporation with its principal place of business in Baltimore, Maryland.

32.    CONNECTICUT GENERAL LIFE INSURANCE COMPANY ("CIGNA") is a Delaware corporation with its principal place of business in Hartford, Connecticut.

33.    EMBLEMHEALTH is a New York corporation with its principal place of

7

business in New York, New York. Its legal name is EmblemHealth Services Company LLC., and it makes these claims on behalf of its licensed healthcare affiliates, which include but are not limited to, Group Health Incorporated and Health Insurance Plan of Greater New York.

34.    GOVERNMENT EMPLOYEES HEALTH ASSOCIATION is a not-for-profit healthcare insurance provider with a principal place of business in Lees Summit, Missouri.

35.    GROUP HEALTH COOPERATIVE is a not-for-profit healthcare insurance provider with its principal place of business in Seattle, Washington.

36.    GROUP HOSPITALIZATION AND MEDICALSERVICES, INC., d/b/a CAREFIRST BLUECROSS BLUESHIELD, is a not-for-profit corporation with its principal place of business in Washington, D.C.

37.    HEALTH CARE SERVICES CORPORATION is a Mutual Legal Reserve Company based in Illinois.

38.    HEALTH NET, INC. is a Delaware corporation with its principal place of business in Woodland Hills, California.

39.    HEALTHNOW NEW YORK, INC. is a New York not-for-profit corporation with its principal place of business in Buffalo, New York.

40.    HIGHMARK INC. is a Pennsylvania not-for-profit corporation with its principal place of business in Pittsburgh, Pennsylvania. Highmark Inc. is now Highmark Health Services f/k/a Highmark Inc.

41.    HIGHMARK WEST VIRGINIA, INC. d/b/a HIGHMARK BLUE CROSS BLUE SHIELD WEST VIRGINIA is a West Virginia not-for-profit corporation with its principal place of business in Parkersburg, West Virginia.

42.    HMO PARTNERS, INC., D/B/A HEALTH ADVANTAGE is an Arkansas

Case ID: 110701465

corporation with its principal place of business in Little Rock, Arkansas.

43.     HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY is a not-for-profit health service corporation with its principal place of business in Newark, New Jersey.

44.     KPS HEALTH PLANS is a Washington not-for-profit healthcare insurance provider with its principal place of business in Bremerton, Washington.

45.     LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA, is a health insurance provider with its principal place of business in Baton Rouge, Louisiana.

46.     MEDICAL MUTUAL OF OHIO (an Ohio corporation) is an Ohio not-for-profit healthcare insurance provider with its principal place of business in Cleveland, Ohio.

47.     NORIDIAN is a North Dakota corporation with its principal place of business in Fargo, North Dakota.  Its legal name is Noridian Mutual Insurance Company.

48.     PREMERA BLUE CROSS is a Washington not-for-profit corporation with its principal place of business in Mountlake Terrace, Washington.

49.     PRIORITY HEALTH is a Michigan not-for-profit corporation with its principal place of business in Grand Rapids, Michigan.

50.     THE REGENCE GROUP is an Oregon not-for-profit corporation with its principal place of business in Portland, Oregon.  Its legal name is Cambia Health Solutions, f/k/a The Regence Group.

51.     USABLE MUTUAL INSURANCE COMPANY, d/b/a ARKANSAS BLUE CROSS AND BLUE SHIELD is an Arkansas corporation with its principal place of business in Little Rock, Arkansas.

52.     WELLCARE HEALTH PLANS, INC. is a Delaware corporation with its

9

principal place of business in Tampa, Florida.

53.    WELLMARK HEALTH PLAN OF IOWA, INC. is an Iowa corporation with its principal place of business in Des Moines, Iowa.

54.    WELLMARK, INC., d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, is an Iowa corporation with its principal place of business in Des Moines, Iowa.

55.    WELLPOINT, INC. is an Indiana corporation with its principal place of business in Indianapolis, Indiana.[2]

56.    Plaintiffs, either directly or through their health plan subsidiaries, insure and administer health plan benefits for their members and group customers, including self-funded group customers that contract with Plaintiffs and their health plan subsidiaries to administer claims on their behalf and to pursue recoveries related to those claims.  Many of these health plan benefits provide members with prescription drug coverage under which claims for drugs manufactured by GSK at the Cidra Plant were submitted and paid.

**Defendant GSK**

57.    GSK is a Delaware limited liability company that has its principal place of business in Philadelphia, Pennsylvania.  GSK's parent company, GlaxoSmithKline plc, is headquartered in London, England and was formed by the merger of Glaxo Wellcome plc and

---

[2]        As an independent licensee of the Blue Cross and Blue Shield Association, WellPoint, Inc. serves members as the Blue Cross licensee for California and the Blue Cross and Blue Shield licensee for Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as the Blue Cross Blue Shield licensee in 10 New York City metropolitan and surrounding counties and as the Blue Cross or Blue Cross Blue Shield licensee in selected upstate counties only), Ohio, Virginia (excluding the Northern Virginia suburbs of Washington, D.C.), and Wisconsin.  In a majority of these service areas, WellPoint, Inc.'s health plan subsidiaries do business as Anthem Blue Cross, Anthem Blue Cross and Blue Shield, Blue Cross and Blue Shield of Georgia and Empire Blue Cross Blue Shield, or Empire Blue Cross (in the New York service areas).  WellPoint, Inc. also serves customers across the country through its UniCare subsidiary and in certain markets through its Amerigroup and CareMore subsidiaries.  WellPoint, Inc. brings this action on behalf of its health plan subsidiaries (collectively "WellPoint").

Case ID: 110701465

SmithKline Beecham in 2000. In recent years it has been reported to be among the world's five largest drug companies. As noted above, GSK is a continuation of SmithKline Beecham and successor to its liabilities. GSK is engaged in the development, manufacture, promotion, sale, and interstate and international distribution of, *inter alia*, prescription drugs. GSK sold and distributed the At-Issue Drugs throughout the United States, including Pennsylvania. During the relevant time period, SmithKline Beecham or GSK had control and authority over the manufacture, sale, and distribution of the At-Issue Drugs manufactured at the Cidra Plant.

## SB PHARMCO

58.     SB Pharmco was a subsidiary of GSK. SB Pharmco owned and operated the Cidra Plant located at Rd. 172, Km 9.2, Bo. Certenejas, Cidra, PR 00739. SB Pharmco was engaged in, among other activities, the manufacturing, processing, packaging, and holding of prescription drugs at the Cidra Plant, including the At-Issue Drugs. In or about January 2001, following the merger between Glaxo Wellcome plc and SmithKline Beecham, the Cidra Plant became one of GSK's largest manufacturing facilities worldwide and a major supplier of prescription drugs to the U.S. market. The Cidra Plant was a SmithKline Beecham manufacturing site before the merger. The plant was responsible for manufacturing a complex portfolio of prescription drugs, including pills, creams, ointments, and injectables. In addition, GSK designated the Cidra Plant as a new product introduction site for solid dose form products, responsible for moving new compounds from development to commercial production.

59.     GSK closed the Cidra Plant in 2009. SB Pharmco was dissolved effective July 3, 2008, but continued to exist under operation of law for three years for purposes of litigation, prosecution, and settlement of its affairs. GSK is liable for the conduct of SB Pharmco during the relevant time period.

Case ID: 110701465

## INDIVIDUAL PARTICIPANTS

60.    The Individual Participants included the following GSK and SB Pharmco executives, who held the positions indicated below during the relevant time period.

61.    David Pulman was GSK's Vice President of Manufacturing and Supply for North America until December 2002, when he became President, Global Manufacturing and Supply.

62.    Janice Whitaker was GSK's Senior Vice President for Global Quality.

63.    Steve Plating was GSK's Vice President for Quality, North America.

64.    Peter Savin was GSK's Vice President of Global Quality Assurance.

65.    Diane Sevigny was GSK's Director of Global Quality Assurance for North America Pharma until July 2003, when she was promoted to Director, Global Quality Assurance, Risk Management and Compliance.

66.    Jonathon Box was GSK's Vice President of Manufacturing and Supply for North America.

67.    Jose Luis Rosado was the President of SB Pharmco Puerto Rico, Inc. and General Manager of the Cidra Plant until April 2003, when he left the company.

68.    Edwin Lopez was SB Pharmco's Director of Quality at the Cidra Plant until the first quarter of 2003, when he was replaced in that role by Adalberto Ramirez and became Director of Laboratories at the Cidra Plant.

69.    Adalberto Ramirez was SB Pharmco's Director of Solid Manufacturing and Packaging at the Cidra Plant until the first quarter of 2003, when he was promoted to Director of Quality at the Cidra Plant.

70.    Gloria Martinez was the Quality Assurance and Regulatory Manager at the Cidra Plant until 2003, when she replaced Adalberto Ramirez as Director of Quality.

Case ID: 110701465

71.    Marion Lon was the Site Director of the Cidra Plant who took over from Joe Luis Rosado in or about April 2003 and was removed from that position in October 2004.

## THE FDA AND cGMPs

72.    The FDA is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, the nation's food supply, cosmetics, and products that emit radiation. The FDA administers, *inter alia*, the Federal Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et seq.*

73.    The FDA endeavors to ensure the safety and efficacy of drugs consumed daily by millions of Americans through a combination of approvals, inspections, and enforcement, but also relies on drug manufacturers to self-regulate and act responsibly and in the public interest. In the FDA's view, drug manufacturers "occupy a virtual fiduciary relationship to the public." *Abbott Laboratories Consent Decree and Individual Responsibility Under the Federal Food, Drug and Cosmetic Act*, 55 Food & Drug L.J. 145, 147 (2000). The "FDA shares this trustee relationship to the consumer with industry leaders, but the initial and ultimate responsibility remains with those leaders. This is true not only because the law makes it so, but also for the practical reason that the FDA cannot be in every factory, much less monitor every decision that is made every day that affects the quality of our food and drugs." *Id.*

74.    In fulfillment of its responsibilities, the FDA enforces cGMPs, which impose on pharmaceutical companies minimum requirements for manufacturing, processing, packing, and holding drugs to assure that they possess the safety, identity, strength, quality, and purity characteristics that they purport to possess. The cGMPS are codified in 21 C.F.R. Parts 210 and 211. Manufacturers demonstrate compliance with cGMPs through written documentation of procedures and practices. The cGMPs dictate, *inter alia*, standards for: personnel engaged in

13

quality control; the design, construction, and maintenance of buildings and facilities; the

construction, cleaning, and maintenance of equipment; the storage, inspection, and testing of

drug components and containers; the control of production and process, including procedures for

sampling and testing of in-process drug products for conformity with specifications and

prevention of microbiological contamination; control of packaging, labeling, storage, and

distribution; laboratory controls, including testing of drug product batches for conformity with

final specifications; the maintenance of records and reports and conduct of investigations; and

procedures for handling returned and salvaged product.

      75.    The FDA has emphasized that cGMP compliance is crucial to assuring that drugs

are safe, effective, and fit for their intended use:

> Adherence to the cGMP regulations assures the identity, strength, quality, and
> purity of drug products by requiring that manufacturers of medications adequately
> control manufacturing operations.  This includes establishing strong quality
> management systems, obtaining appropriate quality raw materials, establishing
> robust operating procedures, detecting and investigating product quality
> deviations, and maintaining reliable testing laboratories.  This formal system of
> controls at a pharmaceutical company, if adequately put into practice, helps to
> prevent instances of contamination, mix-ups, deviations, failures, and errors.  This
> assures that drug products meet their quality standards.

* * * *

> [I]t is important that drugs are manufactured under conditions and practices
> required by the cGMP regulations to assure that quality is built into the design and
> manufacturing process at every step.  Facilities that are in good condition,
> equipment that is properly maintained and calibrated, employees who are
> qualified and fully trained, and processes that are reliable and reproducible, are a
> few examples of how cGMP requirements help to assure the safety and efficacy
> of drug products.

*Facts About Current Good Manufacturing Practices*,

http://www.fda.gov/Drugs/DevelopmentApprovalProcess/Manufacturing/ucm169105.htm.

      76.    Drugs are deemed to be adulterated if the manufacturer fails to comply with

14

cGMPs to assure the drugs' safety, quality, purity, identity, and strength and/or if they are

contaminated.   As provided by 21 U.S.C. § 351(a)(2)(A) & (B), a drug "shall be deemed to be

adulterated . . . if it has been prepared, packed, or held under insanitary conditions whereby it

may have been contaminated with filth, or whereby it may have been rendered injurious to

health; or . . . the methods used in, or the facilities or controls used for, its manufacture,

processing, packing, or holding do not conform to or are not operated or administered in

conformity with current good manufacturing practice to assure that such drug meets the

requirements of this chapter as to safety and has the identity and strength, and meets the quality

and purity characteristics, which it purports or is represented to possess."  It is a violation of 21

U.S.C. § 331(a) to directly or indirectly cause adulterated drugs to be introduced or delivered for

introduction into interstate commerce.

## OVERVIEW OF cGMP VIOLATIONS BY GSK AND SB PHARMCO

77.    GSK's chronic quality assurance problems and ongoing, serious cGMP violations

went to the heart of Cidra's manufacturing, processing, packaging, and quality systems.  As

further detailed below, GSK's misconduct included or resulted in:

>       (a)    product mix-ups, i.e., a drug of a different type or strength found in
> the same bottle;
>       (b)    contamination in products manufactured in the sterile facility,
> including Kytril injection and Bactroban ointment;
>       (c)    substandard quality and control of the plant's water systems,
> resulting in build up of stagnant water and microbial contamination;
>       (d)    manufacturing areas and purportedly clean equipment that
> repeatedly failed routine environmental testing and exhibited microbial
> contamination;
>       (e)    inadequate investigation of out-of-specification results detected
> during laboratory testing;
>       (f)    inadequate process validation and non-existent validation review
> processes for some products;
>       (g)    inadequate or non-existent calibration of equipment and
> instruments and incomplete investigations relating to equipment found to be out-
> of-calibration;

15

(h) overdue process investigations, at times numbering in the hundreds;

(i) chronic failures in the content uniformity of the diabetes drug Avandamet, i.e., repeated finding of super and sub-potent tablets in batches and inadequate investigation of these failures;

(j) obstruction, attrition and understaffing in the Quality Unit and the breakdown of the Quality System;

(k) metal and other foreign particles, including metal shavings and punch lubricant from compression machines, found in drug products;

(l) poor documentation quality, including unsigned, undated and/or lost or missing validation, investigation, and change control documents, and hundreds of Standard Operating Procedures ("SOPs") overdue for revision;

(m) destruction of internal audit reports immediately after discussion with the responsible personnel, contrary to GSK corporate policy and industry practice requiring three-year retention;

(n) serious deficiencies in the functioning of the Microbiology Laboratory, where testing of products and equipment for contamination by objectionable organisms is conducted;

(o) substandard air handling systems not meeting cGMP standards and creating the potential for cross contamination;

(p) inadequate monitoring to ensure containment of a cytotoxic product (Topotecan, a chemotherapy drug) manufactured in the facility;

(q) various other cGMP violations and quality assurance failures, including inadequate identification, control and storage of drug materials, waste and cleaning agents, poor disinfection procedures, leaking equipment, and inadequate verification of product labels.

## PLAINTIFFS' DAMAGES

78.    Plaintiffs estimate that their damages exceed five billion dollars, with further

calculations to be based on evidence developed in discovery or at trial.  Plaintiffs' damages

estimate is based on the following:

(a) the cGMP violations at the Cidra Plant were systemic and pervasive, affecting every aspect of the Plant's operations, including all manufacturing and quality units, and adulterated products were released to the market and paid for by Plaintiffs as a result;

(b) the Cidra Plant was the largest of all of GSK's plants worldwide and at its height produced $5.5 billion of GSK's products annually;

(c) most of Cidra's production was sold in the United States, and until at least 2005 the Cidra Plant was the exclusive manufacturer of most of the At-Issue Drugs for the U.S. market;

(d) among the drugs manufactured at the Cidra Plant were Paxil (a top-selling antidepressant), Avandia and Avandamet (popular diabetes

16

medications), and Coreg (a widely-prescribed heart medication); and

    (e)    during the relevant time period, Paxil and Avandia were among the 50 top-selling drug products in the world.

## FDA WARNING LETTER AND COVER-UP AT CIDRA

**Background**

79.    The Cidra Plant had a history of significant and persistent cGMP violations. That history was summarized in April 2003 in an internal report submitted to senior GSK executives by GSK's then-Manager of Global Quality Assurance, Cheryl Eckard ("Eckard") (who later exposed the egregious violations at the Cidra Plant in a *qui tam* case filed under the federal and state False Claims Acts). In her report, Eckard identified several areas in which the Cidra Plant had been repeatedly cited by the FDA for cGMP violations since 1991, including sterile facility contamination, laboratory investigations, other investigations, documentation, process validation, and computer validation.

80.    The FDA conducted an inspection at Cidra from March 29, 2001 to July 6, 2001. The FDA found significant cGMP deficiencies such as process validation deficiencies in Paxil OS (Oral Suspension) batches, inadequate out-of specification and complaint investigations, inadequate laboratory controls, inadequate media fills, non-stability indicating deficient analytical methods (i.e., inadequate testing to ensure that drug products could meet their purported shelf life), and deficiencies related to the aseptic (i.e. sterile) filling operation (relating to the production of injectable drugs). The FDA investigator who conducted this inspection initially recommended issue of a Warning Letter. However, following a meeting with GSK, the FDA judged GSK's response adequate and the inspection was classified VAI (Voluntary Action Indicated). The FDA issued a Form 483 to GSK on or about July 6, 2001.[3]

---

[3]    Under 21 U.S.C. § 374, the FDA is authorized to conduct inspections of drug manufacturing facilities, including inspections of records, files, papers, processes, controls, and facilities. At the

Case ID: 110701465

81.     The FDA conducted another inspection at Cidra from February 7, 2002 to April

10, 2002.  Again, the FDA found significant cGMP violations such as the release to market of

Bactroban ointment not meeting specifications, inadequate process validation of Paxil OS and

Thorazine tablets, inadequate microbiological controls in Bactroban ointment production areas,

inadequate laboratory investigations, inadequate instrument calibrations, and inadequate water

sampling techniques.  On April 10, 2002, the FDA issued another Form 483 to GSK.  GSK

submitted a written response to the FDA stating its position on each observation and describing

corrective and preventive steps it proposed to take.  The FDA was not satisfied with this

response and issued a Warning Letter to Cidra on or about July 1, 2002 ("Warning Letter").

82.     The Warning Letter detailed a number of significant cGMP violations at Cidra,

including:

> (a)     release to the market of Bactroban Ointment that was contaminated
> with microorganisms;
> (b)     failure to manufacture Paxil OS in accordance with established
> specifications and to demonstrate a reproducible and reliable manufacturing
> process;
> (c)     failure to adequately validate the manufacturing process for
> Thorazine tablets, including failure to test Thorazine tablets for friability and
> content uniformity;
> (d)     failure to conduct statutorily-mandated investigations in a timely
> manner and to take corrective actions to prevent recurrence, including
> investigations of High Total Plate Count results in water samples that took more
> than five months to complete or that were not completed at all; and

---

conclusion of such inspections, the FDA may provide the manufacturer with a Form FD483 (also known
as a Form 483) or a list of "observations" representing violations the FDA has observed. The
manufacturer is expected to respond in writing to each observation, stating its position and any corrective
action it proposes to take.  The FDA takes this response into account in deciding whether further
enforcement action is warranted.  The FDA may then issue a Warning Letter. 21 U.S.C. § 336.  The
Warning Letter is the FDA's primary means of notifying manufacturers of serious violations and of
achieving prompt corrective action.  The manufacturer must respond in writing to the Warning Letter
within 15 days, stating what action is being taken to correct the violations, what action will be taken to
prevent similar violations, and the time frame for such action.

Case ID: 110701465

       (e)     media fill vials (used to test for sterility of injectable drug product) were not incubated for the required time to assure bacterial growth for both slow and fast microorganisms.

**GSK's Response to the FDA**

83.    On or about July 2, 2002, GSK met with the FDA to discuss issues arising from the Form 483 and the Warning Letter. GSK and SB Pharmco representatives at that meeting included Janice Whitaker ("Whitaker"), Senior Vice President for Global Quality; Steve Plating ("Plating"), Vice President for Quality North America; Jose Luis Rosado ("Rosado"), the President and General Manager of the Cidra Plant; and Adalberto Ramirez ("Ramirez"), Director of Solid Manufacturing and Packaging at the Cidra Plant. The FDA stated at the meeting that it would not issue pending requested approvals for GSK's new diabetes drug, Avandamet, and for a new antibiotic, Factive, both of which were to be manufactured at the Cidra Plant, until GSK's response to the Warning Letter was deemed adequate by the FDA and the FDA had reinspected the Cidra Plant.

84.    In early July 2002, GSK Global Quality Assurance Manager Eckard traveled to Cidra to assist in the preparation of the Plant's preliminary response to the Warning Letter, which was delivered to the FDA on or about July 17, 2002. At approximately the same time, GSK agreed that it would immediately notify the FDA if any problems were found that could present a public health risk.

85.    On or about July 17, 2002, GSK made the following specific commitments to the FDA in response to the Warning Letter received on July 1, 2002, and the Form 483 received on April 10, 2002:

       (a)          provide a progress report to the FDA on or before August 15, 2002;

       (b)          review laboratory investigations:

       (c)          review all investigation reports from 2000 to date and

Case ID: 110701465

prepare a summary of findings, this review to be conducted by consultants;

    (d)        define an action plan for corrective actions;

    (e)        evaluate the adequacy of current SOPs for handling out-of specification investigation results;

    (f)        determine the adequacy of corrective actions taken;

    (g)        activate functions of the Senior Management Incident Reporting Team ("SMIRT") (Quality Council), a team established in 2002 after the FDA observed that Cidra senior managers were insufficiently involved in quality control;

    (h)        prepare a Site Validation Master Plan;

    (i)        review all process validation reports to assure compliance with current guidelines;

    (j)        conduct training on handling of laboratory investigations;

    (k)        activate the Lab Calibration/Metrology Unit;

    (l)        discuss with the FDA's Compliance Division and Division of Anti-Infectives the microbial specification requirements for Bactroban;

    (m)        define the sampling and testing for Paxil OS batches;

    (n)        establish a plan to assure that all investigations are completed within 30 days;

    (o)        review adequacy of media fills documentation from 2001 to July 2002;

    (p)        assessment of all systems;

    (q)        hire additional Quality Assurance ("QA") Staff;

    (r)        ensure adequate validation of Thorazine tablets;

    (s)        perform additional validation of the tablet process rejection system for Factive; and

    (t)        ensure adequate validation of Paxil OS.

86.      On or about August 7, 2002, Eckard was assigned by GSK headquarters in Research Triangle Park, North Carolina, to lead the Warning Letter Recovery Team in Cidra.

87.      Eckard's role was to coordinate and oversee the work of Compliance Action Plan Team Leaders who were assigned to each functional area, including Materials, Equipment, Facilities/Utilities, Validation, Laboratory, Computer Validation, Quality Assurance, Production, and Calibration. The Team Leaders were to work on their action plans on a fully dedicated basis for the seven weeks following August 7, 2002, and to communicate serious incidents to top management with the objective of resolving the Warning Letter issues and making the site ready for FDA reinspection, which was a precondition to obtaining FDA approval for Avandamet and

Case ID: 110701465

Factive. The reinspection was scheduled to commence on or about October 9, 2002. There were over 100 people on the Warning Letter Recovery Team, approximately 75 of them from the Cidra Plant and 25 from GSK headquarters.

88.    Shortly after her arrival at Cidra, Eckard asked Cidra's Quality Assurance and Regulatory Manager, Gloria Martinez, to report on any compliance issues that the FDA had not identified in its recent inspections.

89.    Martinez presented an internal report during a Senior Management Incident Reporting Team ("SMIRT") meeting on or about August 14, 2002, which was attended by Cidra senior managers including Rosado. Martinez outlined the following compliance issues:

> (a)      **Product mix-ups:** Cidra had filed at least seven Field Alert reports[4] with the FDA during 2002 arising from complaints of product commingling from patients, pharmacies, or physicians, i.e., tablets of a different type or strength were found in the same bottle. Martinez also stated that Cidra had internally identified nine product mix-up incidents at the plant. Eckard also learned that in the Field Alerts filed with the FDA arising from consumer complaints, Cidra had assured the FDA that the mix-ups could not have happened at the plant, despite the fact that nine separate and contemporaneous similar incidents had been identified inside the plant. Product mix-ups typically are treated in the industry as Class I or Class II recall events,[5] yet no recalls had been initiated. Cidra had made no attempt to correct the cause of the mix-ups and had lied to the FDA in its Field Alert filings by stating that the mix-ups must have occurred outside of Cidra's control.

---

[4]      Pursuant to 21 C.F.R. § 314.81 (b)(1)(i) and (ii), manufacturers are required to notify the FDA by filing a Field Alert within three working days of the receipt of: (i) information concerning any incident that causes a distributed drug product or its labeling to be mistaken for, or applied to, another article; (ii) information concerning any bacteriological contamination, or any significant chemical, physical, or other change, or deterioration in the distributed drug product, or any failure of one or more distributed batches of the drug product to meet the specifications established for it in the new drug application.

[5]      Under 21 C.F.R. § 7.40, "[r]ecall is a voluntary action that takes place because manufacturers and distributors carry out their responsibility to protect the public health and well-being from products that present a risk of injury or gross deception or are otherwise defective." The FDA has established three categories of recalls according to the level of hazard involved: Class I is a situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death; Class II is a situation in which use of or exposure to a violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote; Class III is a situation in which use of or exposure to a violative product is not likely to cause adverse health consequences. http://www.fda.gov/Safety/Recalls/ucm165546.htm.

Case ID: 110701465

(b)        **Overdue process investigations:**  Process investigations are conducted when deviations in the manufacturing process give rise to concerns that product quality may be compromised.  Such investigations must be completed within 30 days.  In August 2002, there were 283 overdue process investigations.  Cidra continued to manufacture and release product notwithstanding the potential impact on the quality of released batches.

(c)        **Equipment not calibrated:**  Equipment calibration is a requirement of the cGMPs.  Cidra did not have a calibration program for the laboratory, and over 20,000 pieces of equipment were in urgent need of calibration in the manufacturing areas.  As a result, the validity of data gathered during manufacture and testing to assure product quality could not be relied upon as accurate.

(d)        **Standard Operating Procedures overdue:**  Written procedures, commonly referred to as SOPs, are the foundation of a pharmaceutical manufacturing plant's documentation system.  These SOPs must be routinely reviewed and revised to take account of changing conditions and circumstances.  In August 2002, 366 SOPs were overdue for review and revision at Cidra.

(e)        **Annual product reviews overdue:**  21 C.F.R. § 211.180 requires that manufacturers conduct reviews of data at least annually for the purpose of evaluating the quality standards of each product.  Martinez described numerous product reviews that were more than a year out of date.

90.        Immediately after the SMIRT meeting on or about August 14, 2002, Eckard phoned Plating at GSK's headquarters in North Carolina.  She gave him the information that she had received at the meeting.  She recommended that GSK stop shipping all product from the Cidra Plant, stop manufacturing product for two weeks in order to investigate and resolve the issues raised and the impact on released batches, and notify the FDA about the product mix-ups.  Eckard faxed to Plating the slides that Martinez had used in her presentation, consisting of approximately 13 pages ("the Martinez presentation").

91.        On or about August 15, 2002, Eckard returned to GSK headquarters in North Carolina, where she immediately reported her concerns to Whitaker.  Eckard reached Whitaker, who was out of the country, by phone.  Eckard gave Whitaker the information that she had

Case ID: 110701465

received at Cidra, including that Cidra had lied to the FDA in its Field Alert filings. She recommended that GSK stop shipping all product from the Cidra Plant, stop manufacturing product for two weeks in order to investigate and resolve the issues raised and the impact on released batches, and notify the FDA about the product mix-ups. Eckard reminded Whitaker that GSK had promised the FDA at the July 17, 2002 meeting that GSK would immediately notify the FDA if any problems were found that could present a public health risk. Eckard told Whitaker that she believed the Cidra Plant was headed for a Consent Decree[6] if the problems were not handled with speed and integrity. Eckard left a copy of the Martinez presentation on Whitaker's desk.

92.    On or about August 18, 2002, Eckard met with Plating to reiterate the concerns she had communicated to him by phone on August 14, 2002.

93.    In September 2002, Eckard spoke by phone with David Pulman, who was then GSK's Vice President of Manufacturing and Supply for North America, and who was promoted to President, Global Manufacturing and Supply in December 2002. Plating had provided Pulman with a copy of the Martinez presentation on or about August 15, 2002. Pulman's overriding concern was to make the Cidra Plant ready for the FDA reinspection to commence on or about October 9, 2002. As stated above, passing this inspection was a precondition to obtaining FDA approval for Avandamet and Factive. Pulman asked Eckard for specific examples of the quality problems at the Cidra Plant. She gave him examples and later sent him, via email, a report prepared by the Director of Validation for the sterile facility at GSK's Barnard Castle plant in the

---

[6]    The FDA, acting through the Department of Justice, is authorized to seek injunctions. 21 U.S.C. § 332. Injunctions are sought when there is a likelihood that violative acts will continue or recur. A Consent Decree of permanent injunction may be obtained, *inter alia*, where there have been multiple and continuing cGMP violations that have not been voluntarily corrected by the manufacturer. In such cases, the facility will typically be placed under the monitorship of an independent expert. Cidra was in fact placed under a Consent Decree in April 2005.

Case ID: 110701465

United Kingdom, who had been brought in to review validation in the sterile suite in Cidra. His report, which referred to certain sterile facility operations as "death by a thousand cuts," was scathing. Eckard told Pulman that nothing had improved at the Cidra Plant since her report to Plating on or about August 24, 2002.

94.    Eckard did not have the authority to order recalls or suspension of manufacturing or shipment of product, or to report regulatory concerns to the FDA. Pulman and Whitaker had the authority to order such actions. Throughout 2002 and into April 2003, Eckard continued to urge GSK managers to take the actions that she had recommended and to correct the quality and compliance problems at the Cidra Plant. They failed to do so.

95.    Whitaker, Pulman, and other GSK executives were unwilling to acknowledge the gravity of the cGMP violations at the Cidra Plant, and to take the corrective actions that Eckard had recommended, in part because the FDA had indicated that it would not consider approvals for Avandamet and Factive until the Warning Letter issues were resolved. Such approvals were unlikely to be obtained if the FDA learned of the gravity of the quality assurance deficiencies at the Cidra Plant. Once approval for Avandamet was achieved, GSK and Cidra management alike lost interest in correcting the deficiencies at the Cidra site and resumed their focus on maximizing productivity at the Plant. As stated above, the Cidra Plant manufactured $5.5 billion of GSK's product annually and was the most important of all of GSK's plants worldwide.

96.    On or about August 20, 2002, Eckard returned to Cidra. The Compliance Action Teams continued to prepare for the Avandamet reinspection, which was held in October. The focus of the inspection was on the progress of the recovery effort. During the inspection, GSK and SB Pharmco informed the FDA that it had put together Corrective and Preventive Action Plans for all of the plant's functional areas and intended fully to implement them. Avandamet

was approved by the FDA on October 8, 2002. Factive was approved on April 4, 2003.

97.     Eckard left Cidra and returned to North Carolina immediately after the inspection, having been at the plant for a period of ten weeks. Three weeks later, she returned to Cidra to resume work on Warning Letter recovery and the longer-term correction of the Cidra Plant's systemic quality assurance and compliance problems. However, Rosado and Ramirez stated that they wanted to take over the leadership of that effort, including leadership of the Compliance Action Teams. Following a meeting with Plating, it was agreed that Ramirez would lead the effort and Eckard would play an "oversight" role and report to Plating.

98.     Thereafter, Eckard visited Cidra periodically for 1-3 days at a time, on each occasion receiving a progress report from Ramirez and reporting to Plating almost on a daily basis.

99.     On or about January 24, 2003, Rosado, Plating, Ramirez, and Edwin Lopez, Cidra's Director of Quality, met with the FDA to discuss the Form 483 and Warning Letter commitments set forth in Paragraph 75 above. Eckard attended that meeting but was not on the agenda and did not present any items.

100.     In or about February 2003, Eckard learned that Ramirez had repeatedly lied to her about the status of work in the written and oral progress reports he had provided to her since assuming control of Warning Letter recovery. She also learned that the Compliance Action Teams had been disbanded immediately after the FDA's October reinspection and the approval of Avandamet, and that Rosado, Ramirez, and Lopez had misrepresented to the FDA the true status of Warning Letter recovery at the January 24, 2003 meeting (as further set forth below). Eckard reported those concerns to Plating and to her immediate boss, Diane Sevigny, GSK's Director of Global Quality Assurance for North America Pharma.

Case ID: 110701465

101.    From February 4 through 8, 2003, Eckard and two other personnel from North Carolina headquarters in Research Triangle Park, representing the Global Quality Assurance team, conducted an internal audit at Cidra ("the February 2003 RTP Audit"). The audit found continuing serious quality control problems and cGMP violations. The audit's findings were communicated to Rosado, Ramirez, Lopez, and senior GSK managers Sevigny, Plating, and Jonathon Box, the Vice President of Manufacturing and Supply for North America, who took Pulman's job when Pulman was promoted in December 2002. Aspects of the February 2003 RTP Audit are discussed further below.

102.    Following Eckard's findings in the February 2003 RTP Audit and her discovery that Ramirez had lied to her about the status of progress by the Compliance Action Teams, Eckard told Sevigny in substance that Eckard would not participate in a cover-up of the quality assurance and compliance problems at Cidra and would not take part in any further meetings with the FDA about the Cidra Plant. During that period and thereafter, Eckard and Sevigny were in frequent and increasing conflict about GSK's management of the quality and compliance problems at Cidra.

103.    Eckard continued to press GSK senior management for action. In or about March 2003 Eckard prepared a binder of materials detailing the quality assurance and compliance problems at Cidra and presented it to Plating and Marion Lon ("Lon"), who became the site director of Cidra when Rosado retired on or about April 1, 2003. Eckard also asked to meet with Plating and Lon.

104.    On or about April 2, 2003, Eckard delivered to GSK senior managers Box, Peter Savin (Vice President of Global Quality Assurance), Whitaker, Plating, and Sevigny, and Cidra managers Lon and Ramirez, a detailed memorandum on Current Compliance Risks for

Case ID: 110701465

Manufacturing and Supply of Drug Products at Cidra ("the April 2003 Report"). Eckard

provided Ramirez with a copy. The April 2003 Report detailed high-risk compliance problems

in the following areas:

    (a)    product mix-ups;
    (b)    documentation quality;
    (c)    computer validation;
    (d)    sterile manufacturing facility activities and documentation,
including Kytril injection;
    (e)    quality and control of water systems; and
    (f)    out-of-specification events for environmental monitoring of
manufacturing areas and clean equipment.

    105.    Eckard's April 2003 Report called for increased monitoring by GSK management

of compliance improvement initiatives at Cidra. However, she did not receive any response to

her Report from any of the seven GSK managers to whom she sent it.

**Eckard's Termination, Report to GSK's Compliance Department and Report to the FDA**

    106.    In early May 2003, Eckard received a phone call from the GSK Human Resources

Department advising her that she was being offered a redundancy package. Eckard stated that

she was not interested in a package, but she was told that she had no choice. In late May, she

was formally terminated.

    107.    Even after her termination, Eckard continued her efforts to have GSK address

Cidra's quality and compliance problems. In or about July 2003, she called GSK's General

Counsel and Chief Executive Officer in the United Kingdom, who declined to speak with her.

She then called GSK's General Counsel in the United States and explained the general nature of

her concerns to his secretary. The secretary referred Eckard to the Vice President for

Compliance, Arjun Rajaratnam. Eckard phoned him on or about July 14, 2003 and provided him

with details of the serious quality assurance and compliance problems at Cidra.

    108.    On or about August 27, 2003, Eckard participated in a teleconference with GSK

Case ID: 110701465

compliance personnel in which she again detailed her concerns. As a result of this call, she formed the view that the Compliance Department lacked authority internally and that regardless of the outcome of its investigation, if any, GSK was unlikely to take any corrective action. On the same day, she called the FDA's San Juan District Office, where she spoke with Compliance Officer Carmelo Rosa. For two to three hours, she detailed all of the serious quality assurance and compliance problems at Cidra.

109.    On or about October 3, 2003, following a phone conversation with the Compliance Department, Eckard called Rosa at the San Juan District Office of the FDA and informed him that GSK did not intend to take any corrective actions as a result of her report.

110.    Shortly thereafter, the FDA executed search warrants at the Cidra Plant and commenced a criminal investigation. The FDA also conducted a lengthy inspection, resulting in a December 2003 Form 483 citing numerous cGMP violations. The FDA conducted another inspection of the Cidra Plant in the second half of 2004, issuing a Form 483 again citing numerous cGMP violations. In March 2005, the FDA seized all stocks of two Cidra products, Avandamet and Paxil CR, the biggest seizure in FDA history. In April 2005, the FDA placed the Cidra Plant under a Consent Decree and permanently enjoined GSK from directly or indirectly introducing or delivering into interstate commerce adulterated product from the Cidra Plant. The FDA required that an independent monitor oversee cGMP compliance at the facility. In late 2007, GSK announced that it would shut down the Cidra Plant, stating that only one product was still made there. The Cidra Plant closed in late 2009.

## EXAMPLES OF cGMP VIOLATIONS
## AND QUALITY ASSURANCE FAILURES SUPPORTING PLAINTIFFS' CLAIMS

111.    The cGMP violations and quality assurance failures at the Cidra Plant, and the resulting drug adulteration and other serious problems, which were known to, and covered up by,

GSK and SB Pharmco, include the following:

**Product Commingling**

112.    As set forth above, Eckard learned on or about August 14, 2002 that Cidra had received a number of complaints of product commingling from patients, pharmacies, and hospitals in 2002.  In other words, consumers found tablets of a different drug type, or different strength in the same bottle.  Additional complaints were received during 2003.  Those complaints reported the following:

      (a)    Avandia 8 mg mixed with Avandia 4 mg;
      (b)    Paxil 30 mg mixed with Paxil 10 mg;
      (c)    Coreg 12.5 mg mixed with Coreg 6.25 mg;
      (d)    Coreg 6.25 mg mixed with Coreg 3.125 mg;
      (e)    Paxil 40 mg mixed with Paxil 20 mg;
      (f)    Avandia 4 mg mixed with Avandia 8 mg;
      (g)    Paxil 20 mg mixed with Benadryl 25 mg;
      (h)    Paxil 10 mg bottle contained unidentified pink tablets (Paxil 10 mg is yellow);
      (i)    Paxil 40 mg mixed with Paxil 30 mg;
      (j)    Paxil 10 mg bottle contained unidentified peach/brownish tablets;
      (k)    three Paxil CR 12.5 mg bottles contained unidentified pink tablets (Paxil CR 12.5 is yellow);
      (l)    Avandia 2 mg mixed with Avandia 4 mg;
      (m)    Paxil CR 25 mg pink mixed with Paxil CR 12.5 mg; and
      (n)    Paxil CR 37.5 mg mixed with Paxil CR 25 mg.

113.    GSK filed Field Alert reports with the FDA with respect to these consumer complaints.  GSK told the FDA in each case that, following an investigation, it had determined that the product mix-ups were very unlikely to have occurred at the Cidra Plant, for example, because of "the extensive controls in our packaging areas."  Those statements were knowingly false.

114.    Between approximately January 2002 and June 2003, Cidra generated internal investigation reports concerning incidents of commingling, which were not reported to the FDA, as follows:

Case ID: 110701465

| | | |
|---|---|---|
| (a) | Avandia 4 mg mixed with Tagamet OTC 200 mg; | |
| (b) | Avandia 8 mg mixed with Avandia 4 mg; | |
| (c) | Coreg 25 mg mixed with Coreg 6.25 mg; | |
| (d) | Ecotrin 81 mg mixed with Stelazine 2 mg; | |
| (e) | Paxil 30 mg mixed with Avandia 4 mg; | |
| (f) | Paxil 30 mg mixed with Paxil CR 12.5 mg; | |
| (g) | Paxil 20 mg mixed with Paxil 25 mg; | |
| (h) | Tagamet HB mixed with Avandia 4 mg; | |
| (i) | Tagamet OTC mixed with Avandia 8 mg; | |
| (j) | Avandia 8 mg mixed with Paxil 10 mg; | |
| (k) | Coreg 6.25 mg mixed with Paxil 20 mg; | |
| (l) | Coreg 25 mg mixed with overweight tablets found during packaging; | |
| (m) | Paxil DC 10 mg mixed with two defective tablets found during packaging; | |
| (n) | Tagamet OTC mixed with Coreg 6.25; and | |
| (o) | Paxil DC 10 mg mixed with Coreg 3.125 mg. | |

115.    Despite these numerous product mix-ups discovered at the site, GSK repeatedly misrepresented to the FDA in Field Alert reports responding to consumer complaints referred to above that its manufacturing and packaging processes were beyond reproach, that it was extremely unlikely that the mix-ups occurred on site, and that they must have occurred outside GSK's control.  For example, in January 2003, GSK filed a Field Alert report with the FDA following a pharmacist's complaint of finding Paxil 30 mg tablets in a Paxil 40 mg bottle.  GSK told the FDA that "given the current process controls in place, it was highly unlikely that this situation occurred on our premises."  The above-listed mix-ups identified at the site, however, show that the similar incidents reported by consumers were, in fact, highly likely to have occurred on Cidra's premises, and that GSK knew that.

116.    When Eckard learned of the mix-ups in or about August 2002, she pressed Cidra managers for additional information about the cause.  She was told that they likely arose from the re-use of undedicated bulk fiber board drums in tablet suites.  In other words, drums used in the processing of one type or strength of tablet had been re-used for a different type or strength

Case ID: 110701465

of tablet. Eckard was also told that uncoated tablets of one type were being mixed with uncoated tablets of another type, so that a tablet of a different type in a final batch would only be recognizable by its size or shape, and not by its color.

117.    In or about August 2002, Eckard asked Cidra management to conduct a full analysis of the problem as a matter of priority. A report was not issued until May 2003. This report concluded that "most mix-ups occurred in the compression area in Cidra II Building and were found to be related to drum cleaning and preparation." In other words, Cidra's internal investigation confirmed that the consumer-reported mix-ups likely did *not* occur outside the plant (as GSK had earlier informed the FDA), but were a result of failure to properly clean out drums that were used to prepare one type or strength of drug before the drum was reused for another type or strength of drug. Still, GSK did not inform the FDA of these findings or initiate any product recalls.

118.    The problems with product mix-ups continued long after Eckard was terminated. In the Form 483 that the FDA issued on December 2, 2003, the FDA told SB Pharmco:

> Your firm fails to have appropriate procedures and controls in place to prevent mix-ups and/or adverse effects to product from occurring during the manufacturing/packaging process. Furthermore, batches are released by your Quality Unit for distribution although you are aware of findings of mix-ups prior to these batches being released to market.

> Product mix-up incidents have been repeatedly occurred [sic] since year 2001 through 2003. Products mentioned in the above examples were approved and released for distribution. Furthermore, complaints related to product mix-ups have been received since year 2001-2003 . . . . Nevertheless you have informed the FDA through FARs [Field Alert Reports] and previous and the current inspection that all incidents are isolated and not related to your manufacturing operation.

119.    Product mix-ups were concealed by the Cidra Site Director, Marion Lon, who took over that position from Jose Rosado in April 2003. SB Pharmco admitted in its guilty plea:

31

Case ID: 110701465

"From in or about at least January 2004 until in or about October 2004, the Cidra Site Director

collected rogue tablets from the manufacturing areas and packaging lines, kept them in a

gowning hat in her office, and failed to alert site and above-site quality personnel."

120.    In the Form 483 issued to Cidra on November 20, 2004, the FDA informed SB

Pharmco:

> Procedures for the cleaning and maintenance of equipment are deficient regarding
> inspection of the equipment for cleanliness immediately before use.  Specifically,
> line clearance's procedures and controls are not appropriate to prevent mix-ups
> during the manufacturing/packaging processes.  The following line clearance's
> related incidents occurred at the firm during the period of January-August 2004 in
> products that were released . . . [listing eight separate instances].

> About three (3) complaints related to product packaging/mix-ups have been
> received since 12/2003 that could be related to batches manufactured/packaged
> within the same period of time and/or the same area of the complaint's lots.

> However, your firm relied on the adequacy of cleaning and line clearance's
> controls to conclude that it was unlikely that the situation was originated within
> the packaging area at GSK-Cidra.  There is no assurance that adequate controls
> are in place as to prevent mix-ups during your manufacturing operations.

> The responsibilities and procedures applicable to the quality control unit are not
> fully followed.  Specifically, your Quality Control Unit failed to conduct a
> thorough investigation of all the events associated with line clearance to prevent
> mix-ups during the manufacturing/packaging process according to your written
> procedures . . . [citing two examples in October 2004].

**Contamination in Products Manufactured in the Sterile Facility**

121.    Injectable medications were manufactured in Cidra's "sterile facility."  In her

April 2, 2003 Report, Eckard cited the sterile facility and Kytril injection as a high-risk

compliance area.  That concern was confirmed in a June 2003 audit report by Global Quality

Assurance ("GQA") personnel ("the June 2003 GQA Audit"), which found that "[o]perations do

not comply with current QMS [Quality Management System] expectations and a recent

campaign has resulted in rejected batches due to high bioburden of bulk solution."  That Audit

32

Case ID: 110701465

called for the manufacture of Kytril injection to be immediately suspended due to high levels of contamination, and called for "capital expenditure" to improve conditions of sterile operations or else closure of the sterile facility "with a sense of urgency."

122.    In fact, GSK and SB Pharmco had known for years about the serious problems with contamination of supposedly sterile injectable drugs at the Cidra Plant, but had never addressed them. In or about January 2001, GSK performed a compliance risk assessment of Cidra and found, among other "high priority" findings, that "[a]wareness needs to be heightened for current and future sterile expectations" and that "[a]septic filling areas had no barrier technology to protect components and point of fill" from contamination. One of GSK's conclusions was that "the aseptic filling area has not been updated with barrier technology nor has the operation progressed technologically beyond its initial, dated design (circa 1980's)."

123.    In or about December 2001, a GSK expert reviewed the Cidra sterile suite and concluded that "[f]or the introduction of new or transferring sterile products, the current areas are not appropriate. Detailed improvements will be required which would require a capital project." The expert noted that "[p]resent areas and ways of working would not meet major regulators' . . . current expectations."

124.    On or about October 9, 2002, the FDA issued a Form 483 observation that: "[p]rocedures designed to prevent microbial contamination of drug products purporting to be sterile were not followed. Specifically, the quality control unit did not assure that adequate systems and controls were in place to monitor sterile areas used to manufacture sterile drug products." But those problems were never addressed.

125.    In June 2003, there was an investigation at the Cidra Plant into microbial growth in 15 of the 19 Kytril lots manufactured in the first production run of 2003 at Cidra. The cause

Case ID: 110701465

was determined to be failure to clean holding tanks, resulting in a proliferation of at least five

different types of microbes "TNTC [too numerous to count]."

126.    In its guilty plea, SB Pharmco admitted that:  "Between in or about April 29, 2003

and May 28, 2003, SB Pharmco released . . . lots of Kytril that were deemed adulterated because

the manufacturing processes and laboratory testing were insufficient to assure the Kytril was of

the quality and purity that Kytril was represented to possess."

127.    Bactroban ointment, while not a sterile product, was also manufactured in the

sterile facility at Cidra.  Bactroban is an antibiotic ointment that is used, amongst other things, to

treat impetigo, a contagious skin infection that is common in small children.  As with Kytril,

GSK and SB Pharmco knew about problems with contamination of Bactroban for years but

never took the required steps to address it and released contaminated lots to the market.

128.    Release to the market of Bactroban ointment that was contaminated with

microorganisms was cited by the FDA in both the April 2002 Form 483 and the July 2002

Warning Letter, by which time GSK had long known about (but failed to act to correct) the

problem of contaminated Bactroban.  For example, the April 2002 Form 483 stated:

> Your Quality Control Unit (QCU) failed to reject drug products not meeting
> established specifications and quality control criteria.  Specifically, your QCU
> failed to properly review batch records and laboratory analysis reports for
> Bactroban ointment lot 50-1B25.  Consequently, this batch that was contaminated
> with *Pseudomonas fluorescens*, an objectionable organism, was released into the
> market on June 1, 2001. . . .
>
> This oversight was not noticed until Investigation 01-207 was initiated six months
> later in November 2001 to investigate continuous problems with microbial
> contamination in Bactroban lots. . . .
>
> Your firm failed to recognize and evaluate the possible risk of this contamination
> in a product used to treat impetigo in small children.  Your firm did not recall this
> lot until this issue was brought up during the inspection and a conference call was
> held with CDER [Center for Drug Evaluation and Research at the FDA].

Case ID: 110701465

> Your firm failed to investigate and evaluate the reason for recurrent
> contamination with the organism CDC Group IV c-2 (*Ralstonia paucula*) in
> Bactroban Ointment and its impact that it might have on safety and efficacy of
> Bactroban ointment. Lots 2901B25, 62-1B25, 84-1B25, 94-1B25, and 105-1B25
> were contaminated with this organism and were released and distributed to the
> market . . . .
>
> Your procedures and actions designed to prevent objectionable microorganisms in
> drug products not required to be sterile were not effective . . . .

129.    In an April 2002 audit, GSK identified the cause of the Bactroban contamination.
That audit found that "the final portion of batches were filled as manufacturing operators opened
the tank and hand scraped the tank and hopper walls facilitating the filling of the final portion but
potentially introducing objectionable organisms as a result of this human intervention," and that
a likely cause of the contamination was that manufacturing operators "could inadvertently
introduce the contaminated water into the end of the batch while performing the tank/hopper
scrape down."

130.    GSK advised the FDA that this contaminating practice had been discontinued. If
it was, it was re-instituted shortly thereafter. SB Pharmco admitted in its guilty plea that "[a]fter
a new Cidra Site Director [Marion Lon] was appointed in April 2003, the practice of manually
scraping the Bactroban tanks was re-instituted to increase yield of Bactroban ointment, with
projected cost savings of $128,074." SB Pharmco also admitted that: "In June 2003, the Cidra
Site Director's new Director of Manufacturing congratulated the 'Semisolids Unit' for salvaging
Bactroban that was 'being wasted' by the failure to scrape the tanks and the hopper, resulting in a
reduction in waste from 84 kg to 1.25 kg per lot, an increase in production of 3,343 units, and an
increase in output from 88% to 97.7%."

131.    The distribution of contaminated Bactroban lots therefore continued. The June
2003 GQA Audit documented the release to the market on March 4, 2003 of a further lot of

Case ID: 110701465

Bactroban contaminated with the same microorganism as the one that resulted in an FDA-mandated recall of Bactroban in February/May 2002. This microorganism, *Ralstonia paucula*, is associated with human infection such as bacteranemia, urinary tract infections, meningitis, wound infection, and peritonitis. The June 2003 GQA Audit also found that there was no formal validation to support the microbial cleaning of the holding tank for Bactroban ointment. It classified Bactroban production as a major problem area that could significantly impact product quality requiring immediate corrective action.

132.    Still, the problem was not corrected. For example, SB Pharmco admitted in its guilty plea: "On or about October 24, 2003, SB Pharmco released Lot 71-3B25 of Bactroban Ointment for distribution in interstate commerce . . . despite the fact that potentially objectionable gram positive organism *staph spp. not aureus or intermedius* was identified on equipment used to manufacture the lot. Lot 71-3B25 of Bactroban Ointment was deemed adulterated because the manufacturing processes and laboratory testing procedures were insufficient to assure that the Bactroban was of the strength, identity, quality and purity that [it] was represented to possess."

**Substandard Quality and Control of Water Systems**

133.    In her April 2, 2003 Report, Eckard cited quality and control of water systems as a high-risk compliance area at Cidra due to an increase in the number of investigations related to the isolation of objectionable organisms in the water system. Eckard noted that there was a project underway to upgrade the water system. However, this project was not progressing. The June 2003 GQA Audit identified water systems as a major problem that could significantly impact product quality requiring immediate corrective action. The auditors noted that the system design allowed for build-up of stagnant water exhibiting microbial contamination. They called

36

for the critical assessment and redesign of the water systems with swift implementation.

134.    In the Form 483 issued to Cidra on December 2, 2003, the FDA cited Cidra's failure to have an up-to-date validated water system, noting that the system had last been validated in 1982. Since 1982, several major changes had been made so that the system was completely different from the system validated in 1982. Not only had it not been validated, but the engineering diagrams did not match the actual location of points of use.

**Out of Specification ("OOS") Events for Environmental Monitoring of Manufacturing Areas and Clean Equipment**

135.    In the April 2, 2003 Report to GSK management, Eckard noted that manufacturing areas and equipment that had purportedly been cleaned to eliminate chemical and microbial contamination failed routine environmental testing on more than a dozen occasions during 2002. She also noted that the microbiology laboratory investigated 8 events of contamination in negative controls (i.e., control swabs used in testing for microbial contamination of equipment and manufacturing areas) in 2002, as well as inadequate investigation of root cause.

136.    The June 2003 GQA Audit cited continuing contamination of negative controls in 2003, and the recovery of objectionable organisms from sampling plates collected during manufacture. The auditors noted that production continued even though two separate investigations failed to determine root cause. The auditors classified this as a major problem that could significantly impact product quality requiring immediate corrective action.

137.    In the Form 483 issued to Cidra on November 5, 2004, the FDA cited Cidra's failure to conduct investigations of OOS results found during microbiological surface monitoring on manufacturing equipment. The FDA also found that there were no written procedures for the cleaning and maintenance of equipment on which microbial contamination was found, and that

Case ID: 110701465

there were deficiencies in the testing methodologies used in monitoring equipment for microbiological contamination.

**Laboratory Investigations**

138.    Manufacturers are required to conduct laboratory testing of each drug lot prior to release into the market to determine conformity with the final specifications of the drug product, including the identity and strength of each active ingredient. 21 C.F.R. § 211.165(a). When OOS results are found, i.e., products fail to meet specifications or other quality control criteria, the batch must be rejected. 21 C.F.R. § 211.165(f).

139.    OOS results may be due either to error made in the laboratory during testing or to a drug sample that indeed does not conform to the specifications. When the initial assessment cannot document laboratory error, a full-scale failure investigation must be conducted. 21 C.F.R. § 211.192. This is a crucial step in the quality assurance process: root cause must be identified so that appropriate preventive action can be taken. Examples of potential causes of OOS results not attributable to laboratory error are: an improperly validated process, production operator error, improperly functioning production equipment, use of OOS components, and improper environmental conditions.

140.    As stated above, on or about January 24, 2003, Rosado, Plating, Ramirez, and senior Cidra staff members met with the FDA to discuss Warning Letter Commitments ("the January 24, 2003 Meeting"). One of the Corrective and Preventive Action items that GSK represented to be complete was its Review of Laboratory Investigations. GSK represented that a review of all investigation reports from 2000 to date had been conducted by consultants and a summary of findings prepared; that an action plan had been defined for corrective actions; that an evaluation of the adequacy of current SOPs for handling OOS investigations had been

conducted; and that the adequacy of corrective actions taken had been determined.

141.    In fact, as GSK well knew, Cidra's laboratory investigation review was far from complete. In or about August 2002, GSK had hired a consulting firm, The Weinberg Group, Inc. ("Weinberg"), to conduct a retrospective OOS laboratory investigations audit for the period from 2000 to August 2002. The purpose of the audit was to review Cidra's findings arising from investigations of OOS results for products that had been released to the market still containing shelf life (i.e., unexpired batches) and to state whether Weinberg concurred or did not concur with those findings and with Cidra's decision to release the product. This encompassed some 500 investigations. At that time, GSK told the FDA that in the event of any "do not concur" findings by Weinberg that could present a public health risk, GSK would immediately advise the FDA. At the time of the January 24, 2003 Meeting, Weinberg had conducted its review and prepared a summary of findings, including that it did not concur with at least 30 of Cidra's findings. Unbeknownst to the FDA, GSK had agreed with Weinberg that any investigations resulting in a "do not concur" finding would be reinvestigated by Cidra and re-evaluated by Weinberg. Further, a March 2003 internal report prepared by Cidra personnel ("the March 2003 Cidra Report") listed some four additional laboratory investigations during the 2000-2002 period that had not been reviewed by Weinberg at all at the time of the January 24, 2003 Meeting. Therefore, GSK's representation to the FDA that the laboratory investigations review was complete was knowingly false, since more than 30 investigations were still outstanding.

142.    In addition, in many cases Cidra did not conduct laboratory investigations with adequate skill and diligence and failed to conduct follow-up investigations required by the cGMPs. For example:

(a)    A great many of Cidra's investigations, both those that were covered by the Weinberg review and those that post-dated the period of that

39

review (August 2002), incorrectly assigned a root cause of "determinate" laboratory error, when in fact the root cause was "indeterminate laboratory error." In other words, the investigation purported to find the cause of the OOS result as an identified laboratory error when such cause had not been proved but was merely theoretical. As stated above, 21 C.F.R. § 211.192 requires that a full-scale failure investigation be conducted when the initial assessment cannot document laboratory error. As a result of GSK's incorrect assignment of cause, the required follow-up investigations were never conducted and thus product released to the market was potentially suspect.

(b)    In the Form 483 issued by the FDA to Cidra on December 2, 2003, the FDA noted that 29.4% of laboratory investigations during 2002 and 2003 were attributed to analyst error, and yet no effort was made to properly investigate the root cause of the error and no corrective or preventive actions were taken to avoid recurrence. The FDA concluded that investigations of batch failures were not adequate in that they were not conducted to conclusion and there was no follow-up.

(c)    An unusually and unacceptably high number of laboratory investigations conducted by Cidra arose as a result of "unknown peaks" detected during routine laboratory testing. "Unknown peaks" appearing on a chromatograph during routine laboratory testing of drug samples indicate that the drug lots may be contaminated. These investigations frequently assigned the root cause of the "unknown peak" as contamination from glassware or other equipment used in the analytical process, but without adequate proof. As a result, Cidra limited the root cause to laboratory error and did not conduct any additional investigation. The number of reported cases of contamination from glassware was so high that any objective investigator would have considered and investigated cross-contamination in the production facility, including contamination arising from environmental conditions, manufacturing equipment, air handling systems, and water systems. All of these areas of the production facility were identified in the June 2003 GQA Audit as areas in which there were serious deficiencies that could significantly impact product quality and required immediate corrective action. Yet GSK ignored cross-contamination as a possible cause and failed to take corrective action arising from "unknown peaks" and instead focused on re-evaluation of its procedures for laboratory glassware washing.

(d)    In the Form 483 issued to Cidra on December 2, 2003, the FDA cited GSK's failure to effectively avoid or reduce the incidence of "unknown peaks" in analytical analysis, documenting numerous instances for multiple products in which unknown peaks were attributed to glassware contamination without proper investigation or follow-up. The FDA concluded that Cidra's investigation of these unexplained discrepancies was inadequate in that it did not extend to other batches that may also have been associated with the specific discrepancy, i.e., "unknown peaks," though recurrent, were treated as isolated

incidents and attributed to glassware without any investigation of a possible systemic cause affecting other released batches.

**Process Validation**

143.    Process validation is a quality control measure for obtaining, recording, and interpreting the results required to establish that a process will consistently yield product complying with predetermined specifications. Manufacturers are required to establish written procedures for production and process control designed to assure that drug products have the identity, strength, quality, and purity they are represented to possess. 21 C.F.R. § 211.100. The execution of the validation protocol, the test results and approvals are supposed to be documented in a validation report. Changes in process may render the process no longer valid, and manufacturers are expected to establish a system that monitors processes, equipment, and personnel so that unintended changes are identified, as well as to conduct periodic process reviews. Process validation is key to assuring that quality, safety, and effectiveness are designed and built into the product rather than relying on quality inspection of the finished product, and that each step in the manufacturing process is controlled to maximize the probability that the finished product meets all quality and design specifications.

144.    Inadequate validation of Paxil OS and Thorazine was cited by the FDA in the April 2002 Form 483 and Warning Letter to Cidra. In addition to correcting those specific problems, GSK promised the FDA in or about August 2002 that it would review process validation for all products, many of which had not been reviewed for periods of up to ten or more years. GSK told the FDA on January 24, 2003 that it had reviewed all process validation reports to assure compliance with current guidelines. In fact, many elements of this review were incomplete. For example:

(a)    In the March 2003 Cidra Report, Cidra documented 29 laboratory

41

investigations, dating from 1995 through 2002, that required review in order to determine the impact on validation certification for the drugs in question. Those drugs included Avandia, Paxil, Relafen, Albenza, Compazine, Factive, Dyrenium, Bactroban, and Kytril injection. While the Report marked this review as being complete on December 30, 2002, the review was in fact still outstanding.

(b)    The February 2003 RTP Audit identified the need for specific compliance questions concerning the validation of Kytril injection to be rectified before additional batches of the drug could be manufactured. Cidra nonetheless proceeded with the manufacture of Kytril injection. The March 2003 Cidra Report identified an action item described as: "Issue a document addressing the concerns raised by Richard Kettlewell [the Director of Validation for the sterile facility at GSK's Barnard Castle plant in the United Kingdom] in the process validation assessment of Kytril." (See above.) While this item was marked as complete at December 30, 2002, it was not, in fact, complete, as evidenced by the findings of the February 2003 RTP Audit.

(c)    Further, the June 2003 GQA Audit noted that Cidra did not have any validation review processes in place for non-sterile products and that reviews must be conducted no less than every three years. (Non-sterile refers to all drug products other than injectable drugs.) The auditors classified this deficiency as one that could significantly impact product quality and required immediate corrective action.

(d)    In the Form 483 issued to Cidra on December 2, 2003, the FDA cited Cidra's failure to question the adequacy of the validation of Avandamet despite repeated OOS findings for assay, content uniformity and dissolution in batches of active ingredient and finished product. None of the OOS investigations conducted in 2003 sought to determine whether the manufacturing process was robust and reproducible. In the Form 483 issued to Cidra on November 5, 2004, the FDA observed that these OOS results for Avandamet persisted, and still Cidra "had not determined the root cause for the failures, if all the OOS results were related to each other, and how to correct the problem."

(e)    In the same Form 483, the FDA cited Cidra's failure to have a validated process for Paxil OS (oral suspension), a liquid product, and Cidra's failure to "demonstrate that it would consistently produce a product within specification. Since year 2001 to 2003, changes . . . have been implemented in an attempt to produce a validated process, with at least 7 out of 22 batches failing the uniformity/assay test."

**Equipment Calibration**

145.    21 C.F.R. § 211.68(a) requires that automatic, mechanical, and electronic equipment be inspected or checked according to a written program to ensure proper performance,

and that written records of calibration and inspection be maintained according to a written program. The FDA expects that calibration will be performed both before and after validation studies to ensure the validity of the data gathered. If equipment is found to be out of calibration, investigations should be conducted to determine whether there was any impact on product quality.

146.    Inadequate instrument calibration was one of the areas of non-compliance cited by the FDA in the Form 483 issued to Cidra in April 2002. When the Warning Letter was issued in August 2002, Cidra still had no calibration program at all for the laboratory. As part of the Warning Letter recovery process, Cidra established a calibration program for the laboratory and calibrated some 20,000 pieces of equipment in the manufacturing facility. However, Cidra did not coordinate this process with validation studies as required by the FDA, and thus the validity of data gathered could not be relied upon as accurate.

147.    At the January 24, 2003 meeting, GSK told the FDA that it had completed the task of activating the Laboratory Calibration/Metrology Unit. In fact, at the time of the February 2003 RTP Audit, the timeline for the calibration corrective action plan was not on target. For example, the auditors cited one item for which the completion date was unknown, and one item that had not even been started by the stated completion date.

148.    Further, the June 2003 GQA Audit found that investigations of equipment found to be out of calibration were not being conducted in a timely manner. The auditors noted that due to the high number of incomplete investigations it was difficult to assess the impact of out-of-calibration conditions on product quality. The auditors classified this deficiency as one that could significantly impact product quality and required immediate corrective action.

Case ID: 110701465

**Overdue Process Investigations, Including Avandamet**

149.   Process investigations must be conducted whenever a mistake or irregularity is detected during the manufacturing process.  These may arise, for example, from an OOS result that is not proven to be caused by laboratory error (see above), from the discovery of mixed up product, or from a finding that purportedly cleaned equipment is dirty.  Process investigations must be completed within 30 days.  *See United States v. Barr Laboratories, Inc.*, 812 F. Supp. 458, 468 (D.N.J. 1993).

150.   As stated above, when Eckard learned in August 2002 that hundreds of process investigations were overdue, she urged GSK management to shut the plant down immediately while the matters identified therein were resolved.  The March 2003 Cidra Report confirmed that in August 2002, there were 283 overdue process investigations.  Cidra continued to manufacture and release product notwithstanding the potential impact on the quality of released batches.

151.   In the February 2003 RTP Audit, Eckard and the other auditors noted that while Cidra had provided computer printouts for process investigations conducted during 2002 and 2003, no clear data for process investigations conducted during 2000 and 2001 had been made available.  The auditors noted that they had been provided with logbooks for the period 2000-2001, which appeared to show that numerous (perhaps several hundred) process investigations were still outstanding.  Cidra denied that any investigations were overdue from that time period but never provided the auditors with any definitive data.

152.   An example of the Cidra Plant's inability to complete investigations within 30 days is its process investigation relating to Avandamet commenced in or about April 2003:

(a)      As stated above, Avandamet was approved by the FDA in October 2002.  The process investigation should have been initiated in or about December 2002, when a number of failures and problems were observed during manufacture.  Those failures resulted in the rejection of several batches of the

Case ID: 110701465

product for lack of content uniformity, assays (tests for purity) that failed to meet specification, and granulation that did not flow appropriately, so that some tablets were sub-potent and others were super-potent.

(b)    Finally, a process investigation was undertaken in or about April 2003 to determine root cause and any impact on batches that had been released to the market. The investigation was still outstanding in May 2003, when Eckard was terminated. No Field Alert was filed with the FDA, as required when the quality of batches or product released to the market are suspect. 21 C.F.R. § 314.81 (b)(1)(ii).

153.    In the Form 483 issued to Cidra on December 2, 2003, the FDA observed that the numerous investigations of OOS results for assay and content uniformity in Avandamet in 2003 were not completed in a timely manner. The FDA cited specific investigations that took three months to complete and others that had been opened in May and June of 2003 and remained open at the time the Form 483 was issued in December. In the Form 483 issued to Cidra on November 5, 2004, the FDA again cited grossly overdue Avandamet investigations, including one that was open for 74 days and another that was open for 81 days.

**Content Uniformity Failures (i.e., Super- and Sub-Potency) in Avandamet**

154.    In the Forms 483 issued to Cidra in 2003 and 2004, the FDA cited Cidra's failure to question the adequacy of the manufacturing process for Avandamet, failure to take corrective action when batches were found to be OOS for assay and content uniformity, inadequate investigations of those OOS findings, failure to determine the root cause despite recurring batch failures over a period of two years, and failure to investigate the impact of identified OOS findings on already released batches. For example, in September 2004, Cidra rejected a batch of Avandamet due to OOS results in the content uniformity of the rosiglitazone active ingredient, but failed to investigate and released to the market 26 other batches made with the same batch of rosiglitazine.

155.    In its guilty plea, SB Pharmco admitted that a definitive root cause of the repeated

Case ID: 110701465

Avandamet batch failures was not formulated until 2005, when GSK sent head office experts to Cidra to conduct an investigation. These experts concluded that the cause was related to a granulating machine that had been improperly calibrated for an unknown period of time, and to a modification that had been made to another granulating machine used to produce rosiglitazone that resulted in the production of over-sized granules.

156.    Rosiglitazone is an active ingredient in Avandia, a top-selling diabetes medication also exclusively produced at Cidra for the U.S. market.

157.    In its guilty plea, SB Pharmco admitted that it released to the market Avandamet that was adulterated "because the manufacturing processes and laboratory testing procedures were insufficient to assure that the Avandamet was of the strength, identity, quality and purity that Avandamet was represented to possess."

**Obstruction, Understaffing and Attrition in the Quality Unit and Failure of the Quality System**

158.    The cGMPs require drug manufacturers to have a distinct Quality Unit that is responsible for ensuring that drug products produced and released to the market meet all applicable standards. Personnel employed in the unit must be appropriately trained and must be of sufficient number. 21 C.F.R. 211.25(c). The Quality Unit is responsible for ensuring that procedures are implemented during the manufacturing process to ensure drug product quality and for conducting investigations of apparent errors, including ensuring that investigations of laboratory testing results that may impact the identity, strength, purity, and/or safety of drug products are completed in a timely manner and that corrective actions are taken when necessary. 21 C.F.R. § 211.22.

159.    As noted above, Marion Lon became the Site Director in charge of Cidra when Jose Rosado retired on or about April 1, 2003. Lon consistently interfered with and obstructed

the critical quality functions at Cidra. SB Pharmco admitted in its guilty plea that "from in or

about April 2003 through September 2004, the Cidra Site Director [i.e., Lon] interfered with the

functioning of Cidra's Quality Unit by, for example: ordering all investigative reports to be

recorded in Spanish to make the results more difficult for GSK Corporate Quality Auditors to

review, directing that no investigations into possible process deficiencies be opened without her

prior approval, challenging the content of investigative reports prepared by the Quality Unit, and

otherwise engaging in inappropriate actions to interfere with the Quality Unit at Cidra."

160.    Cidra's Quality Assurance unit also was chronically understaffed. In or about

August 2002, Cidra told the FDA that it would add 17 QA Staff. At the January 24, 2003

Meeting, Cidra told the FDA that it had hired 23 people. However, it did not tell the FDA that

many experienced staff had resigned from the QA unit. Therefore, the actual increase in staff

fell short of the promised number. This attrition rate continued in 2003.

161.    Lon's interference with the QA and other important functions led to resignations

of experienced managers in the QA Unit and elsewhere, which exacerbated the already serious

problems at Cidra. As SB Pharmco admitted in its guilty plea:

> In or about July 2003, certain key managers at Cidra resigned as a result of the
> new Site Director's lack of leadership skills and poor management style. Those
> managers included, among others, a Quality Assurance Director, the Director of
> Solids Manufacturing and Packaging, a Manufacturing and Packaging Director,
> and the Human Resources Director. . . . From in or about July 2003 through
> September 2004, additional managers and other employees at Cidra resigned as a
> result of the Site Director's interference and management style. Those managers
> and other employees included, among others, the Packaging Engineering Leader,
> Validation Manager, Laboratory Manager, Equipment Validation Scientists,
> Facilities Validation Scientist, and Computer Validation Scientist. During this
> time frame, various managers and other employees also complained about the Site
> Director's interference and management style, including the Director of Quality
> Assurance and Quality Control, the Director of Compliance, a Quality Manager,
> and the Human Resource Director. In or about October 2004, the Site Director
> was removed.

Case ID: 110701465

162.    The FDA has stated that "[t]he overarching philosophy articulated in both the

cGMP regulations and in robust modern quality systems is: **'Quality should be built into the**

**product, and testing alone cannot be relied on to ensure product quality.'"**[7] Of the six

"systems" that the FDA has identified as the key components in a drug manufacturing facility

(Quality, Production, Facilities and Equipment, Laboratory Controls, Materials, and Packaging

and Labeling), the Quality System is the foundation that oversees the other systems and within

which all of the other systems operate.

163.    The Quality System at Cidra was not independent, did not have authority and

responsibility for making product release and other product-critical decisions, and did not

properly oversee the other five systems as mandated by the FDA and the cGMPs.  In the Form

483 issued to Cidra by the FDA on December 2, 2003, the FDA stated:

> Your Quality Assurance Unit lacks sufficient responsibility and authority to
> exercise the controls necessary to assure that consistent and reproducible
> manufacturing processes and laboratory control are established and followed; that
> scientifically sound and appropriate testing procedures are followed and
> established; and that appropriate corrective actions are taken when process
> deviations or failures of product to meet established specifications occur for drug
> products manufactured by your firm.  The Quality Control Unit also failed to
> assure that adequate and compete records are maintained and that accurate and
> complete reports and information are submitted to FDA when appropriate.

The FDA then cited numerous examples and consequences of these deficiencies.

**Metal and Other Foreign Particles in Drug Products**

164.    In the Form 483 issued to Cidra on November 5, 2004, the FDA cited instances of

metal and other foreign particles found in drug products and Cidra's failure to adequately address

the impact on the quality of approved batches.  These included findings of product granulation

mixed with punch lubricant, metal shavings from a compression machine, iron oxide from the

---

[7]      FDA *Guidance for Industry – Quality Systems Approach to Pharmaceutical cGMP Regulations*
(2006) (emphasis in original).

Case ID: 110701465

engine of a granulating machine, and a metal piece from the ring lock of a drum used to store compression mix. With one exception, the lots were released. No evaluation was made of the quality of the released batches and/or other potentially affected batches.

## Poor Documentation Quality

165.   Documentation is fundamental to drug quality. The cGMPs require all aspects of drug manufacturing to be documented. There must be written procedures for conducting all aspects of a plant's operations, including manufacturing, product development, validation, testing, packaging, storage, and release, and all steps taken in the production of drug products must be documented. *See, e.g.*, 21 C.F.R. § 211.100(a); 21 C.F.R. § 211.180-198. Without proper documentation of manufacturing and quality system processes, there is no evidence that drug products have the quality, purity, identity, and strength that they are represented to possess. In her April 2, 2003 Report, Eckard noted that Cidra had been cited for regulatory violations related to poor documentation quality during FDA inspections in 1991, 1992, 1993, 1994, 2001, and 2002. In that report, Eckard noted that critical documents, including validation, investigation, and change control documents, were often not signed and/or dated, or were lost or missing. She noted that GSK had not responded to regulatory scrutiny by establishing systems to correct the problems.

166.   Written procedures, commonly referred to as SOPs, are the foundation of the manufacturing plant's documentation system. The cGMPs require that there be written procedures for the preparation of master records (21 C.F.R. § 211.186(a)), and the "current good" aspect of the cGMPs requires that procedures be reviewed and updating considered on a regular basis. Most responsible manufacturers review procedures on a one- or two-year cycle. In August 2002, 366 SOPs were overdue for review and revision at Cidra.

Case ID: 110701465

167.    In the Form 483 issued to Cidra on December 2, 2003, the FDA cited several

documentation deficiencies, including a laboratory investigation that had the wrong raw data

attached, which Cidra personnel were unable to explain and for which they could not locate the

correct data.  The FDA also cited inadequate systems to document and/or report daily operational

deviations in the laboratory, inadequate or missing documentation in the laboratory training

program, and inaccurate information recorded in complaint investigations.  In the Form 483

issued to Cidra on November 5, 2004, the FDA cited incomplete batch production and control

records, missing investigation reports, and investigation reports lacking conclusions and

corrective/preventive actions.

**Destruction of Audit Reports**

168.    The cGMPs require that the quality assurance unit review all production records

to ensure errors are fully investigated (21 C.F.R. § 211.22(a)) and that written production and

process control procedures be reviewed (21 C.F.R. § 211.100(a)).  In order to promote self-

auditing, it is FDA policy to obtain copies of internal audit reports only when investigating a

serious health problem or upon order of the court.

169.    GSK policy requires that internal audit reports be retained for three years after all

actions have been completed to facilitate tracking for future observations and that a seven-year

log/record be maintained including the date, scope, auditor, and completion of identified actions.

This is consistent with industry practice.  However, the June 2003 GQA Audit found that Cidra's

standard procedure was to destroy audit reports once the problems had been discussed with the

responsible personnel and to keep no evidence of same.  The auditors found that action plans

were not documented.  They also found that the audit program did not include the aseptic (i.e.,

sterile) area or the air handling system.  They classified auditing as a major problem that could

Case ID: 110701465

significantly impact product quality requiring immediate corrective action.

**Microbiology Laboratory ("Micro Lab")**

170.    Testing of products and equipment for contamination by objectionable organisms was conducted in the Micro Lab.  The June 2003 RTP Audit found a number of serious deficiencies in the functioning of the Micro Lab, including:

        (a)    poor controls of materials used in testing functions, including lack of assurance that media (used to test for growth of microorganisms) meets quality standards;
        (b)    poor document control and lack of data integrity;
        (c)    poor controls of water samples prior to testing for presence of microorganisms;
        (d)    lack of assurance that test samples and materials are maintained at the required temperatures for the duration of incubation and storage periods, and no alarms on equipment for notification of out-of-range conditions;
        (e)    no procedures for identification of trends in water and environmental monitoring; and
        (f)    lack of timeliness in the review and approval of test results.

171.    Deficiencies in environmental monitoring (discussed above) are further evidence of problems impacting the effective functioning of the Micro Lab. The auditors classified the Micro Lab as a major problem area that could significantly impact product quality requiring immediate corrective action.

**Substandard Air Quality**

172.    The cGMPs require that air handling systems be balanced to ensure that they are functioning correctly.  Equipment for controlling air pressure, microorganisms, dust, humidity, and temperature must be provided.  21 C.F.R. § 211.46.  The June 2003 GQA Audit found that the design of Cidra's air handling system did not meet cGMP standards and created the potential for cross-contamination.  The auditors found that pressure differentials were misdirected allowing improper airflow in certain areas.  They classified this as a major problem that could significantly impact product quality requiring immediate corrective action. As stated above, poor

Case ID: 110701465

air quality likely contributed to the high incidence of "unknown peaks" observed during routine laboratory testing, and Cidra had no internal audit program for the air handling system.

**Cytotoxic Research & Development ("R&D") Manufacturing**

173.    Cytotoxic substances cause the destruction or inhibit the function of cells. Manufacture of cytotoxic substances must, for obvious reasons, be strictly quarantined from manufacture of other products.  The June 2003 GQA Audit found that Cidra was engaged in the R&D manufacture of Topotecan, a chemotherapy drug that is associated with serious side-effects, in a contained area in the midst of commercial manufacturing.  The auditors found that air pressure differentials that are crucial to containment of the cytotoxic substance were not properly monitored and documented; the most recent data was dated April 2002.  Further, the auditors found that there was no baseline monitoring in surrounding areas to ensure that toxic substances were contained to the R&D area and had not been tracked into other areas where prescription and over-the-counter drugs were made.  The auditors also found that an area formerly used for Topotecan trials had not been properly decontaminated and decommissioned. They classified this as a major problem that could significantly impact product quality requiring immediate corrective action.

**Other cGMP Issues**

174.    The June 2003 GQA Audit identified the following miscellaneous cGMP issues, and collectively classified them as a major problem that could significantly impact product quality requiring immediate corrective action:

> (a)    raw materials with no identification or status control;
> (b)    product waste inappropriately stored;
> (c)    equipment allowing product leakage creating the potential for cross-contamination;
> (d)    containers of drug product open in unprotected areas;
> (e)    poor controls of lubricants and cleaning agents creating the

Case ID: 110701465

potential for misuse leading to product contamination;

   (f)  H&K encapsulator (a machine that fills and seals capsules) for Dyazide was not cleaned after use;

   (g)  poor controls of disinfectants to ensure that they are free of contamination and within expiration date;

   (h)  no studies to demonstrate effectiveness of disinfection procedures on surfaces in controlled areas;

   (i)  improper storage and inventory tracking of materials used in process validation; and

   (j)  nine of 28 packaging lines not equipped to carry out the required 100% electronic verification of printed materials.

## CONCLUSION

175. When physicians prescribe, patients consume, and health insurance companies pay for, a pharmaceutical drug, they are entitled to trust that the drug has been manufactured with quality and care, i.e., that the drug is safe and has the quality, purity, identity, and strength represented by its manufacturer.  As a foundation of that trust, a manufacturer must comply with cGMPs, and if a drug is not manufactured in compliance with cGMPs to assure its purported quality, purity, identity, and strength, it is deemed adulterated and is prohibited from being distributed to the market.  21 U.S.C. § 351(a)(2)(B).

176. As noted above, GSK's subsidiary SB Pharmco, the operator of the Cidra Plant, has admitted, as part of its federal criminal guilty plea, that, "with intent to defraud and mislead," it distributed four of the drugs manufactured at the Plant, namely Avandamet, Kytril, Bactroban, and Paxil CR, that were not produced in conformity with cGMPs and therefore were adulterated. In fact, and as detailed above, by reason of the systemic and longstanding violations of cGMPs at Cidra, GSK's wrongdoing went far beyond those four drugs and extended Plant-wide to all of the At-Issue Drugs.

177. GSK knew that the systems and processes at the Cidra Plant were in gross violation of cGMPs, and that GSK was therefore prohibited from selling and distributing the At-

Case ID: 110701465

Issue Drugs. Instead of correcting the problems at the Cidra Plant, GSK fraudulently concealed them and continued to distribute huge quantities of adulterated drugs, fraudulently misrepresented the drugs' quality and other material attributes, and consequently reaped from Plaintiffs billions of dollars in unlawful payments each year.

178.    In doing so, GSK, knowingly and with intent to defraud, concealed from Plaintiffs and others the material facts concerning the pervasive cGMP violations at the Cidra Plant, and made express and implied misrepresentations to Plaintiffs and others that the At-Issue Drugs conformed to certain standards of quality, purity, identity, and strength, were not adulterated, and were fit for sale and ingestion. GSK engaged in this scheme to defraud with the intent and effect of deceiving and defrauding the Plaintiffs into paying for those drugs. GSK's misrepresentations and omissions were material, and were justifiably relied upon by Plaintiffs when they paid for the At-Issue Drugs. Plaintiffs would not have paid for the drugs if Plaintiffs had known that they were adulterated, could not lawfully be sold or distributed, and were consequently worthless.

179.    Alternatively, and at the very least, GSK acted recklessly or negligently in misrepresenting and failing to disclose material facts concerning the At-Issue Drugs. GSK is therefore liable to Plaintiffs on those alternative grounds.

180.    In transactions involving Plaintiffs, payment for each of the At-Issue Drugs was made by at least two persons, including one or more Plaintiffs. While Plaintiffs were not the ultimate consumers of the products, they paid the lion's share of the purchase price for the products and suffered direct and proximate injury to their business and property as the result of each such transaction.

## THE ENTERPRISES

181.    For purposes of Plaintiffs' 18 U.S.C. §1962 claims, the "enterprises" in issue are

Case ID: 110701465

SB Pharmco, GSK, and each Plaintiff.  Those entities will be referred to as the "Alternative

Enterprises."  Each Alternative Enterprise is (or was during the relevant time period) a corporate,

single-entity enterprise within the meaning of 18 U.S.C. § 1961(4), which engaged in or affected

interstate commerce.

182.    Each Plaintiff constitutes an enterprise victimized by GSK's misconduct.  GSK

successfully sought to manipulate for its unlawful benefit all major sectors of the healthcare

delivery market, including patients and healthcare providers as well as public and private

insurers.  Plaintiffs were the principal payers for the At-Issue Drugs and the principal victims of

GSK's scheme to defraud, and the fraudulent manipulation of Plaintiffs' vast and complex

insurance coverage and payment processing systems and facilities was essential to the success of

that scheme.  Without exploiting the infrastructure, systems, and facilities owned by Plaintiffs

and operated by their many thousands of employees, GSK could not have effectuated the

pervasive, nationwide distribution and sale of the At-Issue Drugs and reaped the enormous,

unlawful profits that resulted.

183.    As an essential component of its scheme to defraud, GSK, directly or indirectly,

induced Plaintiffs' executives and other employees to authorize the inclusion of the At-Issue

Drugs on Plaintiffs' "formularies" -- the lists of drugs covered by health benefit plans

administered by Plaintiffs -- by representing that the drugs conformed to their purported

attributes, i.e., that they had the safety, quality, purity, identity, and strength that they were

represented to possess, and by omitting material information regarding those

attributes.  Members of Plaintiffs' respective Pharmacy & Therapeutics ("P&T") Committees (or

similar groups) reviewed clinical, scientific, manufacturer, and other information provided by

GSK, directly or through intermediaries, describing, inter alia, the purported therapeutic

properties, clinical benefits, and pricing considerations relating to the At-Issue Drugs that were under consideration for inclusion in Plaintiffs' respective formularies. The P&T Committees (or similar groups), which typically included physicians, pharmacists, and analysts representing clinical and business perspectives, had managerial responsibility and authority to decide whether Plaintiffs should provide coverage to their members and pay for particular At-Issue Drugs, relying on the above-referenced information provided directly or indirectly by GSK.

184.    Once Plaintiffs had placed the At-Issue Drugs on their respective formularies, the drugs were automatically dispensed at pharmacies throughout the United States upon the presentation of a prescription by a plan member covered by one of Plaintiffs' health benefit plans, and Plaintiffs' authorization and payment systems were activated.

185.    Thus, by its knowing and purposeful misrepresentations and omissions, GSK caused each Plaintiff's employees or other agents to provide initial coverage for the At-Issue Drugs; to evaluate, authorize, and process claims for payment for the At-Issue Drugs from pharmacies and pharmacy benefit managers; and to issue payments for the At-Issue Drugs. None of those actions on the part of Plaintiffs would have occurred had Plaintiffs known that the drugs were adulterated, were consequently worthless, and could not lawfully be sold.

186.    As part of its scheme, GSK used, and caused others to use, the United States mail and interstate wires, including by sending claims and making or receiving payments for the At-Issue Drugs. In this way, GSK conducted or participated, directly or indirectly, in the conduct of each Plaintiff's affairs through a pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(5).

187.    It is well-established that the victim of the unlawful activity may also be the enterprise through which the unlawful activity is perpetrated. *See, e.g., Cedric Kushner*

Case ID: 110701465

*Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001) ("[This] Court has held that RICO both

protects a legitimate 'enterprise' from those who would use unlawful acts to victimize it, *United*

*States v. Turkette*, 452 U.S. 576, 591 (1981), and also protects the public from those who would

unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which

'unlawful . . . activity is committed,' *National Organization for Women, Inc.* [*v. Scheidler*], 510

U.S. [249,] 259 [(1994)].").

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(c)

188.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

189.    In executing its scheme to defraud, GSK made extensive use of the United States

mail and interstate wires, including the dissemination of fraudulent statements concerning the

At-Issue Drugs, the transmission of invoices for the drugs, and the receipt of payments for the

drugs.  In addition, it was foreseeable, and GSK knew, that the United States mail and interstate

wires would be used in numerous transactions involving fraudulently induced payments by

Plaintiffs for the At-Issue Drugs.  These number in the hundreds of thousands if not millions for

each Plaintiff.  Illustrative, but not exclusive, examples of such fraudulently induced payments

appear in the chart attached hereto as Exhibit B.

190.    Each such use of the mails and each interstate wire communication in furtherance

of the scheme to defraud violated the federal mail fraud and federal wire fraud statutes, 18

U.S.C. §§ 1341 and 1343.

191.    Each of those violations constitutes activity unlawful under 18 U.S.C. § 1961(1).

Collectively, those violations, systematically carried out over an extended period of time as part

of a scheme to defraud, constitute a pattern of unlawful activity within the meaning of 18 U.S.C.

Case ID: 110701465

§ 1961(5).

192.    The Alternative Enterprises, with the exception of GSK, are distinct from GSK and from the pattern of unlawful activity in which GSK engaged.

193.    GSK is a "person" within the meaning of 18 U.S.C. § 1961(3) that conducted, participated in, operated, managed and/or controlled the affairs of the Alternative Enterprises (with the exception of GSK) through a pattern of unlawful activity, in violation of 18 U.S.C. § 1962(c).

194.    Plaintiffs have been injured in their business and property as a direct and proximate result of GSK's violations of 18 U.S.C. § 1962(c), in that they paid substantial sums for the At-Issue Drugs in justifiable reliance on GSK's fraudulent material misrepresentations and omissions.

195.    By reason of GSK's violation of 18 U.S.C. § 1962(c), GSK is liable to Plaintiffs for three times the damages Plaintiffs have sustained, as well as the other relief specified below. .

### SECOND CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(d) by Conspiracy to Violate 18 U.S.C. § 1962(c)

196.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

197.    In executing its scheme to defraud, GSK made extensive use of the United States mail and interstate wires, including the dissemination of fraudulent statements concerning the At-Issue Drugs, the transmission of invoices for the drugs, and the receipt of payments for the drugs.  In addition, it was foreseeable, and GSK knew, that the United States mail and interstate wires would be used in numerous transactions involving fraudulently induced payments by Plaintiffs for the At-Issue Drugs.  These number in the hundreds of thousands if not millions for each Plaintiff.  Illustrative, but not exclusive, examples of such fraudulently induced payments appear in the chart attached hereto as Exhibit B.

Case ID: 110701465

198.    Each such use of the mails and each interstate wire communication in furtherance of the scheme to defraud violated the federal mail fraud and federal wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

199.    Each of those violations constitutes activity unlawful under 18 U.S.C. § 1961(1). Collectively, those violations, systematically carried out over an extended period of time as part of a scheme to defraud, constitute a pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(5).

200.    The Alternative Enterprises, with the exception of GSK, are distinct from GSK and from the pattern of unlawful activity in which GSK engaged.

201.    GSK is a "person" within the meaning of 18 U.S.C. § 1961(3) that conspired with the Individual Participants and others unknown within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the operation, management and/or control of the affairs of the Alternative Enterprises (with the exception of GSK) through a pattern of unlawful activity.

202.    Plaintiffs have been injured in their business and property as a direct and proximate result of GSK's violation of 18 U.S.C. § 1962(d), in that they paid substantial sums for the At-Issue Drugs in justifiable reliance on GSK's fraudulent material misrepresentations and omissions.

203.    By reason of this violation of 18 U.S.C. § 1962(d), GSK is liable to Plaintiffs for three times the damages Plaintiffs have sustained, as well as the other relief specified below.

## THIRD CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(d) by Conspiracy to Violate 18 U.S.C. § 1962(a)

204.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

205.    In executing its scheme to defraud, GSK made extensive use of the United States

mail and interstate wires, including the dissemination of fraudulent statements concerning the At-Issue Drugs, the transmission of invoices for the drugs, and the receipt of payments for the drugs. In addition, it was foreseeable, and GSK knew, that the United States mail and interstate wires would be used in numerous transactions involving fraudulently induced payments by Plaintiffs for the At-Issue Drugs. These number in the hundreds of thousands if not millions for each Plaintiff. Illustrative, but not exclusive, examples of such fraudulently induced payments appear in the chart attached hereto as Exhibit B.

206.    Each such use of the mails and each interstate wire communication in furtherance of the scheme to defraud violated the federal mail fraud and federal wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

207.    Each of those violations constitutes activity unlawful under 18 U.S.C. § 1961(1). Collectively, those violations, systematically carried out over an extended period of time as part of a scheme to defraud, constitute a pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(5).

208.    GSK is a "person" within the meaning of 18 U.S.C. § 1961(3) that conspired with the Individual Participants and others within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a) in that income in the form of payments for the At-Issue Drugs made by Plaintiffs would be received by GSK, directly or indirectly, from a pattern of activity unlawful under 18 U.S.C. § 1961(1) in which GSK participated as a principal within the meaning of 18 U.S.C. § 1962(a).

209.    An object of the said conspiracy was that income, or the proceeds of income, received by GSK would be used or invested, directly or indirectly, in the operation of GSK for numerous legitimate and illegitimate purposes including, *inter alia*, the marketing, promotion,

Case ID: 110701465

manufacture, distribution, and purported quality assurance of the At-Issue Drugs and the ongoing operations of the GSK Enterprise.

210.    Plaintiffs have been injured in their business and property as a direct and proximate result of GSK's violation of 18 U.S.C. § 1962(d) by acts constituting activity unlawful within the meaning of 18 U.S.C. § 1961(1) (mail and wire fraud, as specified therein), in that they paid substantial sums for the At-Issue Drugs in justifiable reliance on GSK's fraudulent material misrepresentations and omissions.

211.    By reason of this violation of 18 U.S.C. § 1962(d), GSK is liable to Plaintiffs for three times the damages Plaintiffs have sustained, as well as the other relief specified below.

## FOURTH CAUSE OF ACTION
### Common Law Fraud

212.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

213.    GSK knowingly and with intent to defraud made express and implied misrepresentations -- in marketing materials, advertisements, package inserts, and other public statements -- that the At-Issue Drugs were manufactured in accordance with cGMPs to assure their safety and conformity with their purported quality, purity, identity, and strength; that the drugs were safe and possessed those purported attributes; and that the distribution and sale of the drugs were lawful.  GSK knew that those representations were false and baseless.  GSK knew and fraudulently concealed the fact that there were egregious and systemic violations of cGMPs at the Cidra Plant, that the At-Issue drugs were adulterated and their distribution and sale were prohibited, and that consequently the drugs were worthless.

214.    GSK knowingly engaged in this scheme to defraud, and directed, aided and abetted, and conspired with others to engage in the scheme.

215.    GSK's misrepresentations and omissions were material to Plaintiffs' decisions to

Case ID: 110701465

pay for the At-Issue Drugs, and were justifiably relied upon by Plaintiffs when they paid for the drugs. Plaintiffs were directly and proximately injured as a result.

216.    GSK's conduct was fraudulent, oppressive, intentional, wanton, willful, and malicious and in disregard of Plaintiffs' rights.

217.    GSK is liable to indemnify Plaintiffs for the losses and damages Plaintiffs have sustained as a result of GSK's fraud, as well as punitive damages and the other relief specified below.

## FIFTH CAUSE OF ACTION
### Civil Insurance Fraud Under 18 Pa. Cons. Stat. § 4117

218.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

219.    GSK knowingly and with intent to defraud made express and implied misrepresentations -- in marketing materials, advertisements, package inserts, and other public statements -- that the At-Issue Drugs were manufactured in accordance with cGMPs to assure their safety and conformity with their purported quality, purity, identity, and strength; that the drugs were safe and possessed those purported attributes; and that the distribution and sale of the drugs were lawful. GSK knew that those representations were false and baseless. GSK knew and fraudulently concealed the fact that there were egregious and systemic violations of cGMPs at the Cidra Plant, that the At-Issue drugs were adulterated and their distribution and sale were prohibited, and that consequently the drugs were worthless.

220.    GSK knowingly engaged in this scheme to defraud, and directed, aided and abetted, and conspired with others to engage in the scheme.

221.    Plaintiffs are insurers as defined under 18 Pa. Cons. Stat. § 4117(l). GSK presented or caused to be presented to Plaintiffs statements forming a part of, or in support of, claims for health benefits for the At-Issue Drugs that contained false, incomplete, or misleading

Case ID: 110701465

information concerning facts or things material to those claims.

222.    GSK engaged in a pattern of violating the Civil Insurance Fraud Statute, 18 Pa. Cons. Stat. § 4117.

223.    As a direct result of GSK's conduct, Plaintiffs suffered damages, including investigation expenses, costs of suit, and attorneys' fees.

224.    Pursuant to the Pennsylvania Civil Insurance Fraud statute, 18 Pa. Cons. Stat. § 4117, Plaintiffs are entitled to recover treble damages, including investigation expenses, costs of suit, and attorneys' fees, plus interest and other relief specified below.

## SIXTH CAUSE OF ACTION
### Breach of Express Warranty Under 13 Pa. Cons. Stat. § 2313

225.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

226.    GSK expressly warranted to Plaintiffs and others, through, *inter alia*, its product and marketing literature and other public statements, that the At-Issue Drugs conformed to FDA requirements as to safety and possessed certain characteristics of quality, purity, identity, and strength. As a result, the At-Issue Drugs were included in Plaintiffs' formularies and paid for by Plaintiffs.

227.    Plaintiffs were purchasers of the At-Issue Drugs.

228.    GSK's express warranties were part of the basis of the bargain between Plaintiffs and GSK.

229.    GSK's express warranties were false because the manufacturing, quality, and other systems and operations at the Cidra Plaint had serious, chronic, and pervasive defects and did not conform to cGMPs to assure the safety, quality, purity, identity, and strength of the At-Issue Drugs. Therefore, the drugs were adulterated under federal law, they could not be assured to have the safety, identity, strength, quality, and purity characteristics that they purported or

Case ID: 110701465

were represented to possess, and they could not lawfully be sold or distributed in the United

States.

230.    Because it was unlawful for GSK to release the At-Issue Drugs to the market, and

because their safety, identity, strength, quality, and purity were suspect and could not be assured,

the At-Issue Drugs were valueless.

231.    By reason of GSK's breach of its express warranties, GSK is liable to Plaintiffs

for the full amount that Plaintiffs paid for the At-Issue Drugs.

**SEVENTH CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability Under 13 Pa. Cons. Stat. § 2314**

232.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

233.    Pennsylvania law imposes on every transaction in the sale of goods by a merchant

the manufacturer's and seller's warranty that the goods are merchantable.

234.    GSK is a merchant of pharmaceutical products, including the At-Issue Drugs.

235.    Plaintiffs were purchasers of the At-Issue Drugs.

236.    The At-Issue Drugs were not merchantable because the manufacturing, quality,

and other systems and operations at the Cidra Plant had serious, chronic, and pervasive defects

and did not conform to cGMPs to assure that the drugs were safe and of a certain quality, purity,

identity, and strength.  The At-Issue Drugs were therefore adulterated under federal law, they

could not be assured to have the safety, identity, strength, quality, and purity characteristics that

they purported or were represented to possess, and they could not lawfully be sold or distributed

in the United States.  As a result, the At-Issue Drugs were unfit for the ordinary purposes for

which such drugs are used.

237.    Because the At-Issue Drugs were not merchantable, they were valueless.

238.    By reason of GSK's breach of the implied warranty of merchantability, GSK is

64

liable to Plaintiffs for the full amount that Plaintiffs paid for the At-Issue Drugs.

## EIGHTH CAUSE OF ACTION
### Common Law Unjust Enrichment

239.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

240.    By reason of its wrongdoing as alleged above, GSK has been unjustly enriched, in that it has received monies in connection with illegal activities that in equity and good conscience it should not be permitted to keep.  Plaintiffs have suffered losses as a result of GSK's illegal activities in that Plaintiffs have paid money for the At-Issue Drugs that Plaintiffs would not have paid if they had known of GSK's wrongdoing.  Plaintiffs were the primary and ultimate payers for the At-Issue Drugs, and GSK would not have been able to sell and distribute the At-Issue Drugs but for the commitment of payers such as Plaintiffs to continue to pay for them.

241.    There is no justification for GSK's unjust enrichment and no legal principle that is contrary to Plaintiffs' right to restitution.

242.    Plaintiffs are therefore entitled to restitution from GSK in the amount by which GSK has been unjustly enriched.

## NINTH CAUSE OF ACTION
### Common Law Negligent Misrepresentation

243.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

244.    As alleged above, GSK's conduct with regard to Plaintiffs and the At-Issue Drugs was knowing, intentional, and fraudulent.  Alternatively, and at the very least, GSK's conduct was negligent.

245.    As alleged above, GSK made, directed others to make, aided and abetted the making of, and conspired with respect to the making of material false representations that the At-

Case ID: 110701465

Issue Drugs were manufactured in accordance with cGMPs to assure their safety and conformity with their purported quality, purity, identity, and strength and that their distribution and sale were lawful. GSK omitted the material facts that those drugs were adulterated because they were not manufactured in accordance with cGMPs to assure such safety, quality, purity, identity, and strength, and that their distribution and sale were therefore prohibited.

246.    GSK made the statements containing these misrepresentations and omissions under circumstances in which, at the very least, GSK ought to have known of their falsity.

247.    GSK intended to induce Plaintiffs to rely on its misrepresentations and omissions and consequently make payments for the At-Issue Drugs. Plaintiffs were not obligated to make such payments, and Plaintiffs would not have made them but for GSK's misrepresentations and omissions.

248.    GSK's misrepresentations and omissions were material to Plaintiffs' decisions to pay for the At-Issue Drugs, and were justifiably relied upon by Plaintiffs when they paid for the drugs. Plaintiffs were directly and proximately injured as a result.

249.    By reason of its misrepresentations and omissions, GSK is liable to Plaintiffs for the full amount that Plaintiffs paid for the At-Issue Drugs, as well as the other relief specified below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against GSK as follows:

A.    For the First, Second, and Third Causes of Action (18 U.S.C. § 1962 violations), Plaintiffs are entitled to three times the actual damages Plaintiffs have sustained as a result of GSK's misconduct, Plaintiffs' costs of suit, and reasonable attorneys' fees.

B.    For the Fourth Cause of Action (fraud), Plaintiffs are entitled to the actual damages Plaintiffs have sustained as a result of GSK's misconduct, punitive

Case ID: 110701465

damages, Plaintiffs' costs of suit. and reasonable attorneys' fees.

C.    For the Fifth Cause of Action (civil insurance fraud). Plaintiffs are entitled to three times the actual damages Plaintiffs have sustained as a result of GSK's misconduct, Plaintiffs' costs of suit, and reasonable attorneys' fees.

D.    For the Sixth and Seventh Causes of Action (breach of express warranty, breach of implied warranty of merchantability), Plaintiffs are entitled to the actual damages Plaintiffs have sustained as a result of GSK's misconduct.

E.    For the Eighth Cause of Action (unjust enrichment), Plaintiffs are entitled to the amount of GSK's unjust enrichment.

F.    For the Ninth Cause of Action (negligent misrepresentation), Plaintiffs are entitled to the actual damages Plaintiffs have sustained as a result of GSK's misconduct.

G.    For all causes of action. Plaintiffs are entitled to disgorgement of gross receipts, injunctive relief to ensure that GSK's misconduct will not reoccur (including restrictions on individuals responsible for such misconduct), and any additional remedies the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: July 24, 2013

LOWEY DANNENBERG COHEN & HART, P.C.

By: _____

Gerald Lawrence (Pa. Id. No. 69079)
Peter St. Phillip (Pa. I. No. 70027)
200 Barr Harbor Drive. Suite 400
West Conshohocken. PA 19428
(610) 941-2670

*Attorneys for Plaintiffs*

Case ID: 110701465

*Of Counsel*:

LOWEY DANNENBERG COHEN & HART, P.C.
  Geoffrey M. Horn
  Uriel Rabinovitz
One North Broadway, Suite 509
White Plains, NY 10601
914-997-0500

RAWLINGS & ASSOCIATES, PLLC
  Mark D. Fischer
One Eden Parkway
LaGrange, KY 40031-8100
(502) 587-1279

GETNICK & GETNICK LLP
  Neil V. Getnick
  Lesley Ann Skillen
  Stuart Altschuler
Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457
(212) 376-5666

  PROFESSOR G. ROBERT BLAKEY
    G. Robert Blakey
  Professor of Law Emeritus
  Notre Dame Law School*
  7002 East San Miguel Avenue
  Paradise Valley, AZ  85352
  (574) 514-8220
  [*Noted for identification only]

Case ID: 110701465

## VERIFICATION

I. Gerald Lawrence, hereby state that I am an attorney for the Plaintiffs and that I am authorized to make this Verification on behalf of the Plaintiffs; that the parties which I represent lack sufficient knowledge or information upon which to make this Verification and/or that this Verification is made on behalf of parties from whom a verification could not be obtained; and that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge. information, and belief.

I understand that the statements herein are made subject to the penalties of 18 Pa. C.S.A. § 4904 (relating to unsworn falsification to authorities).

Dated:   July 24. 2013

_____
Gerald Lawrence. Esquire

69

Case ID: 110701465

## **VERIFICATION**

I, Lesley Ann Skillen, hereby state that I am an attorney for the Plaintiffs and that I am authorized to make this Verification on behalf of the Plaintiffs; that the parties which I represent lack sufficient knowledge or information upon which to make this Verification and/or that this Verification is made on behalf of parties from whom a verification could not be obtained; and that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.

I understand that the statements herein are made subject to the penalties of 18 Pa. C.S.A. § 4904 (relating to unsworn falsification to authorities).

DATE:  July 24, 2013

Lesley Ann Skillen, Esquire

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. |
| | ) | |
| v. | ) | Violation: |
| | ) | |
| SB PHARMCO PUERTO RICO, INC. | ) | 21 U.S.C. §§ 331(a), 333(a)(2), and |
| | ) | 351(a)(2)(B) Interstate Shipment |
| Defendant | ) | of Adulterated Drugs |
| | ) | |

## INFORMATION

The United States Attorney charges that:

### I.  GENERAL ALLEGATIONS

At all times material to this Information:

#### The Defendant

1.     **SB PHARMCO PUERTO RICO, INC.** ("SB PHARMCO"), was a corporation organized under the laws of the Commonwealth of Puerto Rico with a principal place of business in Cidra, Puerto Rico. **SB PHARMCO** was an indirect subsidiary of GlaxoSmithKline, plc ("GSK"), a British corporation with a principal place of business in Brentford, Middlesex, England, with publicly traded shares on the London Stock Exchange (ticker symbol: GSK) and the New York Stock Exchange (ticker symbol: GSK).

2.     **SB PHARMCO** was engaged in, among other things, the manufacture and interstate distribution of prescription drugs intended for human use throughout the United States, including the District of Massachusetts. **SB PHARMCO** owned and operated manufacturing and packaging facilities in Cidra, Puerto Rico.

Case ID: 110701465

3.    **SB PHARMCO** was dissolved effective July 3, 2008, but continues to exist under operation of law for three years for purposes of litigation, prosecution, and settlement of its affairs.

## The FDA and the FDCA

4.    The United States Food and Drug Administration ("FDA") was the federal agency responsible for protecting the health and safety of the public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA") and ensuring, among other things, that drugs intended for use in humans were safe and effective for their intended uses and that the labeling of such drugs bore true and accurate information.  Pursuant to such responsibility, FDA published and administered regulations relating to the approval, manufacture, and distribution of drugs.

5.    The FDCA defined drugs as, among other things, articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man, and articles (other than food) intended to affect the structure of any function of the body of man.  21 U.S.C. §§ 321(g)(1)(B) and (C).

6.    Prescription drugs under the FDCA were drugs intended for use in humans which, because of their toxicity or other potentiality for harmful effect, or the method of their use, or the collateral measures necessary to their use, were not safe for use except under the supervision of a practitioner licensed by law to administer such drugs, 21 U.S.C. § 353(b)(1)(A), or drugs limited by the terms of FDA approval to use under the professional supervision of a  practitioner licensed by law to administer such drugs, 21 U.S.C. § 353(b)(1)(B).

7.    The FDCA prohibited causing the introduction or delivery for introduction into interstate commerce of any drug that was adulterated.  21 U.S.C. § 331(a).

2

Case ID: 110701465

8.    Under the FDCA, a drug was deemed adulterated if the methods used in, or the facilities or controls used for, its manufacturing, processing, packing or holding did not conform to or were not operated or administered in conformity with current good manufacturing practice ("cGMP") to assure that such drug met the requirements as to safety and had the identity and strength, and met the quality and purity characteristics, which it purported or was represented to possess.  21 U.S.C. § 351(a)(2)(B).

9.    Implementing regulations under the FDCA further defined cGMP required for finished pharmaceuticals, and included, among other specific requirements, the following:

a.    *Quality Control Unit.*  Drug manufacturers were required to maintain a quality control unit with the responsibility and authority to approve or reject all components, drugs product containers, closures, in-process materials, packaging, material, labeling and drug products and the authority to review production records to assure that no errors had occurred or, if errors had occurred, that they were fully investigated.  21 C.F.R. § 211.22(a) (2003).  The quality control unit was to have the responsibility for approving or rejecting all procedures or specifications impacting on the identity, strength, quality, and purity of the drug product.  21 C.F.R. § 211.22(c) (2003).

b.    *Contamination and Product Mix-ups.*  Separate or defined areas or such other control systems were required for the firm's operations as necessary to prevent contamination or mixups during the course of packaging and aseptic processing.  21 C.F.R. §§ 211.42(c)(6) and (10) (2003).  Packaging and labeling facilities were required to be inspected immediately before use to assure that all drug products were removed from previous operations,

3

and results of such inspections were required to be documented in the batch records. 21 C.F.R. §
211.130(e) (2003).

        c.    *Equipment.* Automatic, mechanical or electronic equipment or other types
of equipment used in the manufacture, processing, packing or holding of a drug product was
required to be of appropriate design to facilitate operations for its intended use. 21 C.F.R. §
211.63 (2003). Equipment was required to be routinely calibrated, inspected, or checked
according to a written program designed to assure proper performance. 21 C.F.R. § 211.68(a)
(2003).

        d.    *In-Process Testing.* In-process materials were required to be tested for
identity, strength, quality and purity as appropriate, and approved or rejected by the quality
control unit during the production process, e.g. at commencement or completion of significant
phases or after storage for long periods. 21 C.F.R. § 211.110(c) (2003).

        e.    *Drug Product Testing.* Drug products failing to meet established
standards or specifications and any other relevant quality control criteria were required to be
rejected, unless satisfactorily reprocessed. 21 C.F.R. § 211.165(f) (2003).

        f.    *Production and control records.* Drug manufacturers were required to
prepare drug product production and control records, and to have those records reviewed and
approved by the quality control unit to determine compliance with all established, approved
written procedures, before a batch was released or distributed. 21 C.F.R. §§ 211.188 and 192
(2003). Any unexplained discrepancy or the failure of a batch or any of its components to meet
any of its specifications were required to be thoroughly investigated whether or not the batch was
already distributed, and the investigation was required to extend to other batches of the same

4

drug product and other drug products that may have been associated with the specific failure or discrepancy. 21 C.F.R. § 211.192 (2003).

10.    As part of its mission to enforce the FDCA and protect the public health, the FDA had the authority to enter and inspect, at reasonable times and within reasonable limits and in a reasonable manner, all establishments where drugs were manufactured, processed, packed or held for introduction into interstate commerce or after shipment in interstate commerce. 21 U.S.C. § 374(a)(1). Upon conclusion of the inspection, the FDA had various options, including among others:

a.    *Form 483*. A "Form 483," otherwise known as a "Notice of Inspectional Observations," was issued by the FDA to summarize the cGMP deficiencies observed by the FDA inspectors during a particular inspection.

b.    *Warning Letter*. A "Warning Letter" was issued by the FDA to document the agency's conclusion that certain manufactured products were adulterated, and to provide notice that unless sufficient corrective actions were implemented, further regulatory action would be taken without notice.

11.    Drug manufacturers had certain duties and responsibilities to notify the FDA of information that might impact on the safety or efficacy of the drugs it manufactured, including among others, the following:

a.    *Field Alert Reports*. The manufacturer of a drug subject to an approved new drug application was required to notify FDA in a "Field Alert Report" within three working days of receiving information if the information concerned any bacteriological contamination, or any significant chemical, physical or other change or deterioration in the distributed drug

5

product, or any failure of one or more distributed batches of the drug product to meet the specification established for it under the drug's approved new drug application. 21 C.F.R. § 314.81(b)(1)(ii).

        b.    *Annual Reports.* The manufacturer of a drug subject to an approved new drug application was required to submit to FDA an annual report with the following information, among other information: (1) a brief summary of significant new information from the previous year that might effect safety, effectiveness or labeling of the drug product, 21 C.F.R. § 314.81(b)(2)(i) (2003); (2) reports of experiences, investigations, studies or tests involving chemical or physical properties, or any other properties of the drug that might affect the FDA's previous conclusions about the safety or effectiveness of the drug product, 21 C.F.R. § 314.81(b)(2)(iv)(a) (2003); and a full description of the manufacturing and controls changes not requiring a supplemental application, listed by date in the order in which they were implemented, 21 C.F.R. § 314.81(b)(2)(iv)(b) (2003).

### The Cidra Manufacturing Facility

      12.    In or about January 2001, following the merger between Glaxo Wellcome and SmithKline Beecham pharmaceutical companies, the **SB PHARMCO** Cidra manufacturing site ("Cidra") became one of GSK's largest manufacturing facilities worldwide and a major supplier of prescription drugs to the United States market. Cidra was a SmithKline Beecham site prior to the merger. Cidra was responsible for making a complex portfolio of drugs, including pills, creams, ointments, and injectables. In addition, GSK designated Cidra to be a new product introduction site for solid dose form products, responsible for moving new compounds from development to commercial production, a technically challenging process.

13.     Among other drugs manufactured at Cidra, **SB PHARMCO** made the following

drugs for distribution to the United States, including in the District of Massachusetts:  Kytril (a

sterile injectable anti-nausea medication), Bactroban (a topical anti-infection ointment commonly

used to treat skin infections in adults and children), Paxil CR (the controlled release formulation

of the popular antidepressant drug, Paxil), and  Avandamet (a combination Type II diabetes

drug).

14.     On or about April 1, 2003, GSK retained a new Site Director for Cidra.  In or

about July 2003, certain key managers at Cidra resigned as a result of the new Site Director's

lack of leadership skills and poor management style.  Those managers included, among others, a

Quality Assurance Director, the Director of Solids Manufacturing and Packaging, a

Manufacturing and Packaging Director, and the Human Resources Director.

15.     From in or about April 2003 through September 2004, the Cidra Site Director

interfered with the functioning of Cidra's Quality Unit by, for example: ordering all investigative

results to be recorded in Spanish to make the results more difficult for GSK Corporate Quality

Auditors to review, directing that no investigations into possible process deficiencies be opened

without her prior approval, challenging the content of investigative reports prepared by the

Quality Unit, and otherwise engaging in inappropriate actions to interfere with the Quality Unit at

Cidra.

16.     From in or about July 2003 through September 2004, additional managers and

other employees at Cidra resigned as a result of the Site Director's interference and management

style.  Those managers and others employees included, among others. the Packaging Engineering

Leader, Validation Manager, Laboratory Manager, Equipment Validation Scientists, Facilities

Case ID: 110701465

Validation Scientist, and Computer Validation Scientist. During this time frame, various

managers and other employees also complained about the Site Director's interference and

management style, including the Director of Quality Assurance and Quality Control, the Director

of Compliance, a Quality Manager, and the Human Resource Director. In or about October

2004, the Site Director was removed.

### Contaminants in Kytril

17.    Kytril was a terminally sterilized injectable anti-nausea medication that was

primarily used to treat cancer patients receiving chemotherapy or radiation, and post-surgical

patients who experienced nausea. Kytril injection was manufactured at Cidra in the sterile suite.

Kytril was manufactured in a Single Dose Vial of 1 ml, and a Multi Dose Vial of 4 ml from

which four 1 ml doses could be extracted.

18.    As part of the merger between SmithKline Beecham and Glaxo Wellcome, Kytril

was divested to another pharmaceutical manufacturer. Under the divestiture agreement, **SB**

**PHARMCO** was required to continue to manufacture Kytril at Cidra until an sNDA to transfer

the product was approved.

19.    **SB PHARMCO** manufactured Kytril until in or about December 2003, when

production was transferred to the acquiring entity.

20.    In or about January 2001, following the merger, GSK performed a compliance

risk assessment of Cidra and found, among other "high priority" findings, that "[a]wareness

needs to be heightened for current and future sterile expectations" and that "[a]septic filling areas

had no barrier technology to protect components and point of fill" from contamination. One of

the conclusions of the report was that "the aseptic filling area has not been updated with barrier

Case ID: 110701465

technology nor has the operation progressed technologically beyond its initial, dated design (circa 1980's)."

21.    In or about December 2001, a GSK expert reviewed the Cidra sterile suite and informed **SB PHARMCO** and others that "[f]or the introduction of new or transferring sterile products, the current areas are not appropriate.  Detailed improvements will be required which would require a capital project."  The expert noted that "[p]resent areas and ways of working would not meet major regulators' (e.g. MCA [European regulators]/FDA) current expectations."

22.    On or about July 1, 2002, the FDA issued a Warning Letter to **SB PHARMCO** stating that certain other drug products manufactured at Cidra were adulterated because, among other reasons, **SB PHARMCO** failed to "conduct investigations in a timely manner and to take corrective actions to prevent recurrence."  FDA cited as examples delayed investigations involving the water sampling and media fill vials.

23.    A follow-up FDA inspection was undertaken in the fall of 2002, and on or about October 9, 2002, the FDA issued a Form 483 observation to **SB PHARMCO** that:  "[p]rocedures designed to prevent microbiological contamination of drug products purporting to be sterile were not followed.  Specifically, the quality control unit did not assure that adequate systems and controls were in place to monitor sterile areas used to manufacture sterile drug products."

24.    On or about April 2, 2003, GSK Global Quality Assurance ("GQA") reviewed regulatory risks at Cidra and identified nine areas of risk required to be controlled to avoid future regulatory enforcement activities.  One of the identified risk areas was "sterile manufacturing facility activities and documentation including Kytril Injection."  Another identified risk area was

9

"isolation of objectionable organisms in the water system" and "out of specification events for environmental monitoring of clean equipment."

25.     On or about June 13, 2003, **SB PHARMCO** concluded a trend investigation regarding microbial growth in bulk solution in 15 of the 19 Kytril lots manufactured in the first campaign of 2003 at Cidra.  The cause was determined to be a bottom outlet flange assembly of glass lined holding tanks that was not disassembled and cleaned, causing microbial growth "TNTC" (too numerous to count).  The types of microbial growth included *bacillus cereus, staphylococcus sp., burkholderia cepacia, comamonas testosterone, and stenotrophomonas maltophilia.*

26.     From on or about June 23, 2003 until on or about June 27, 2003, GSK GQA audited Cidra against its Quality Management System ("QMS") and found a major deficiency in the sterile manufacturing of Kytril injectable, noting that "[o]perations do not comply with current QMS expectations and a recent campaign has resulted in rejected batches due to high bioburden of bulk solution."  QMS auditors concluded that "[c]apital expenditure is necessary to improve current conditions or sterile operations should be discontinued with a sense of urgency."

27.     Between in or about April 29, 2003 and May 28, 2003, **SB PHARMCO** released to the company that acquired Kytril for distribution in interstate commerce, including in the District of Massachusetts, certain lots of Kytril that were deemed adulterated because the manufacturing processes and laboratory testing were insufficient to assure the Kytril was of the quality and purity that Kytril was represented to possess.

10

Case ID: 110701465

## Contaminants in Bactroban

28.    Bactroban was a topical antibiotic primarily used to treat skin infections such as impetigo, in adults and children.  Bactroban was manufactured at Cidra both as an ointment and a cream.

29.    On or about June 1, 2001, **SB PHARMCO** released Bactroban Ointment Lot 50-1B25 for distribution in interstate commerce even though it was contaminated with *"pseudomonas fluorescens."*

30.    On or about November 1, 2001, **SB PHARMCO** issued a Field Alert Report to notify the FDA of the release of the contaminated Bactroban Ointment Lot 50-1B25.

31.    On or about February 27, 2002, after additional communications with the FDA regarding the possible health risks of the contaminated Bactroban, **SB PHARMCO** conducted a voluntary recall for Lot 50-1B25.

32.    From on or about February 7, 2002 through on or about April 10, 2002, the FDA inspected Cidra.

33.    On or about April 10, 2002, the FDA issued a Form 483 to **SB PHARMCO** that noted, among other deficiencies, the following:

> Your Quality Control Unit (QCU) failed to reject drug products not meeting established specifications and quality control criteria.  Specifically, your QCU failed to properly review batch records and laboratory analysis reports for Bactroban Ointment lot 50-1B25.  Consequently, this batch that was contaminated with *Pseudomonas fluorescens*, an objectionable organism, was released into the market on June 1, 2001. . . .

> This oversight was not noticed until Investigation 01-207 was initiated six months later in November 2001 to investigate continuous problems with microbial contamination in Bactroban lots. . . .

11

Your firm failed to recognize and evaluate the possible risk of this contamination in a product used to treat impetigo in small children. Your firm did not recall this lot until this issue was brought up during the inspection and a conference call was held with CDER [Center for Drug Evaluation and Research at the FDA].

Your firm failed to investigate and evaluate the reason for recurrent contamination with the organism CDC Group IV c-2 (*Ralstonia paticula*) in Bactroban Ointment and its impact that it might have on the safety and efficacy of Bactroban Ointment. Lots 2901B25, 62-1B25, 84-1B25, 94-1B25 and 105-1B25 were contaminated with this organism and were released and distributed in the market. . . .

Your procedures and actions designed to prevent objectionable microorganisms in drug products not required to be sterile were not effective. . . .

34.     In early April 2002, GSK performed a recall investigation at **SB PHARMCO** to determine the root cause of the improper release of the contaminated Bactroban Lot 50-1B25 to market. The audit found that "the final portion of batches were filled as manufacturing operators opened the tank and hand scraped the tank and hopper walls facilitating the filling of the final portion but potentially introducing objectionable organisms as a result of this human intervention," and that a likely cause of the contamination of the Bactroban was that manufacturing operators "could inadvertently introduce the contaminated water into the end of the batch while performing the tank/hopper scrape down." The audit noted that "the practices of disconnecting the chilled water hose from the tank and scraping the tank have been discontinued."

35.     On April 23, 2002, GSK responded to the FDA's Form 483 observations and represented in part that **SB PHARMCO** had discontinued "human intervention with holding tanks during filling; the practice of manually scraping the holding tanks during filling; and the practice of disconnecting the hoses supplying the water to the jacket of the holding tanks."

12

Case ID: 110701465

36.     In May 2002, as a result of further communications with the FDA, **SB PHARMCO** extended the voluntary recall to five additional lots of Bactroban Ointment that were contaminated with gram-positive organisms that were potentially objectionable.

37.     On or about July 1, 2002, the FDA issued a Warning Letter to **SB PHARMCO** stating that certain drug products, including Bactroban Ointment, were adulterated because of the following cGMP violations, among others: (a) failure of the quality control unit to exert its responsibility and authority as required by 21 C.F.R. § 211.22 to reject all drug product that failed to meet the established specifications; and (b) failure to have in place procedures to prevent microbial contamination of products as required by 21 C.F.R. § 211.113, that resulted in release of certain lots of Bactroban to market contaminated with *Pseudomonas fluorescens* and questionable gram-positive organisms.

38.     After a new Cidra Site Director was appointed in April 2003, the practice of manually scraping the Bactroban tanks was re-instituted to increase yield of Bactroban ointment, with projected 2003 cost savings of $128,074.

39.     In June 2003, the Cidra Site Director's new Director of Manufacturing congratulated the "Semisolids Unit" for salvaging Bactroban that was "being wasted" by the failure to scrape the tanks and hopper, resulting in a reduction of waste from 84 kg to 1.25 kg per lot, an increase in production of 3,343 units, and an increase in output from 88% to 97.7%.

40.     On or about October 24, 2003, **SB PHARMCO** released Lot 71-3B25 of Bactroban Ointment for distribution in interstate commerce, including in the District of Massachusetts, despite the fact that the potentially objectionable gram positive organism "*staph spp. not aureus or intermedius*" was identified on equipment used to manufacture the lot.

13

41.     Lot 71-3B25 of Bactroban Ointment was deemed adulterated because the
manufacturing processes and laboratory testing procedures were insufficient to assure that the
Bactroban was of the strength, identity, quality, and purity that was represented to possess.

### Split Tablets in Paxil CR

42.     Paxil was a drug used to treat depression, anxiety, and pre-menstrual dysphoric
disorder.  The controlled release formulation of the drug, Paxil CR, controlled the rate of
dissolution and absorption of the active ingredient, Paroxetine, in the body.  **SB PHARMCO**
manufactured Paxil CR in varying strengths including 12.5 mg, 25 mg, and 37.5 mg strengths.

43.     Paxil CR had two layers, one containing the active ingredient ("active layer"), and
one containing no active ingredient ("barrier layer").

44.     During the manufacturing process, first the active layer was compressed and then
the barrier layer was added to the active layer for compression into the final bi-layer tablet.  In
development at GSK's Crawley plant in the United Kingdom, GSK used a triple-layer press
machine to perform these functions.

45.     In or about February 2002, **SB PHARMCO** began commercial manufacture of
the Paxil CR tablet, the first and only bi-layer tablet manufactured at Cidra.  Cidra used three
modified single-layer Hata press machines to perform the compression function.  The three Hata
compression machines used by Cidra were less sensitive in their ability to measure the
compression force than the triple-layer press machine GSK used in development.

46.     In or about late March and early April 2002, shortly after commercial production
began, **SB PHARMCO** observed during packaging that some of the Paxil CR tablets separated
between the active layer and the barrier layer.  Split tablets contained either only the active layer,

14

which was absorbed in the body more quickly because of the absence of the controlled release function provided by the barrier layer, or only the barrier layer, which had no active ingredient and no therapeutic benefit for the patient.

47.    **SB PHARMCO** classified the split tablet as a "critical defect" which was defined by **SB PHARMCO** as a defect with "a high probability of causing adverse consequences to the patient or consumer, [or] may result in significant deviations in the safety, identity, strength or purity of the product. . . ."

48.    On or about April 5, 2002, **SB PHARMCO** completed an investigation of split tablets observed in five different lots of Paxil CR 25 mg and concluded that the most probable cause of the splits was that the compression forces on the active layer in commercial production were slightly higher than the compression forces applied during validation, which could result in the barrier layer not adhering to the active layer.  After concluding the investigation, **SB PHARMCO** performed 100 percent visual inspection in an attempt to remove the split tablets, and distributed the five lots.

49.    In or about April 2002, **SB PHARMCO** implemented 100 percent visual inspection of all Paxil CR tablets in an attempt to remove split tablets prior to packaging and release of the product to market.  As **SB PHARMCO** knew, visual inspection of millions of tablets by human operators was subject to error as a result of the quality of the operator's depth perception, speed of the conveyor belt, and other environmental and human conditions.

50.    From in or about December 2002 to February 2003, **SB PHARMCO** conducted a Design of Experiment ("DOE") to determine the cause of the split tablets.  The DOE report concluded that "the splitting of CR tablets occurred because the active layer in side A was

15

compressed using a high pressure, which did not allow a good adhesion of the active layer to the

barrier layer." The DOE report recommended, among other things, that **SB PHARMCO** "use

lower pressures in the active layer compression process, combined with a load cell that could

read those pressures." A load cell was a pressure sensor that detected variations in compression

force, and the DOE report concluded that a "load cell of 50 KGF is required to allow the Hata

[to] read the low pressures required to control the split situation."

51.    Despite its own classification of the split tablet defect as a critical defect, **SB**

**PHARMCO** failed to report the defect or findings of the DOE to the FDA in its 2003 Annual

Report, instead informing the FDA that "[n]o significant new information was obtained during

this reporting period that might affect the safety, effectiveness, or labeling of Paxil (paroxetine

hydrochloride) CR."

52.    In or about February 2004, following a series of studies, **SB PHARMCO**

instituted manufacturing changes to lower the compression force and to monitor tablet weight,

thickness, and hardness during production of the active layer of the 12.5 mg and 25 mg Paxil CR.

**SB PHARMCO** did not install the more sensitive load cells on the Hata tablet presses that were

necessary to allow the Hata presses to read the lower pressures.

53.    After instituting the manufacturing changes, **SB PHARMCO** eliminated visual

inspection of the coated 12.5 mg and 25 mg Paxil CR tablets for splits, and substituted statistical

inspection. The 37.5 mg tablets continued to undergo 100 percent visual inspection. Statistical

inspection involved examination of a sample of 1000 tablets in a batch of approximately 1.5 to 2

million tablets. If no split tablets were found in the sample, the lot was released for packaging

and distribution; if splits were found, the lot was 100 percent visually inspected.

16

54.    The change from 100 percent visual to statistical inspection of Paxil CR was a significant change in the manufacturing process, requiring progression and documentation through **SB PHARMCO's** change control process, which included approval by Cidra's Quality Unit. **SB PHARMCO** did not follow the change control process for the implementation of the statistical inspection protocol.

55.    Following the change from visual to statistical inspection, **SB PHARMCO** continued to find split tablets of Paxil CR 12.5 mg and 25 mg during packaging, both at Cidra and at GSK's packaging facility in Zebulon, North Carolina, which also packaged Paxil CR for Cidra. Five separate investigations of eight different lots were initiated between April and August 2004 relating to the occurrence of splits in 12.5 and 25 mg tablets after compression. **SB PHARMCO** performed 100 percent visual inspection in an attempt to remove the split tablets and distributed these lots

56.    From on or about September 7, 2004 through on or about November 5, 2004, the FDA conducted another inspection of Cidra. The FDA issued a Form 483 to **SB PHARMCO** with the following observation:

> Your firm failed to take adequate corrective and preventive actions to prevent the split tablet defect, classified by your firm as critical defect, in distributed Paxil CR product. Although your process controls include an inspection after the coating process to detect the defect, the defect has been found during the packaging operation of Paxil CR 12.5 tablets and Paxil CR 25 tablets, in approximately 12% and 25% of the batches manufactured/packaged during 2004.

> Furthermore, this defect has been found in distributed products and non-distributed products outside GSK-Cidra premises . . . . [providing five examples].

57.    During the FDA inspection, on or about September 15, 2004, **SB PHARMCO** re-instituted 100 percent visual inspection of 12.5 and 25 mg Paxil CR tablets.

17

58.     In or about November 2004, **SB PHARMCO** purchased sorting machines to conduct 100 percent automated inspection of the thickness of Paxil CR tablets.

59.     Between on or about February 20, 2004 and September 15, 2004, **SB PHARMCO** released certain lots of Paxil CR 12.5 mg and 25 mg tablets for distribution in interstate commerce, including in the District of Massachusetts, that were deemed adulterated because the equipment on which Paxil CR was manufactured was insufficient to ensure that the proper compression force was used on the active layer, and the process controls could not assure that Paxil CR released to market was of the strength, identity, quality and purity that the drug was represented to possess.

<u>**Content Uniformity Failures in Avandamet**</u>

60.     Avandamet was a drug used to treat diabetes.  Avandamet was a tablet comprised of two substances blended together in specific amounts.  Those substances were rosiglitazone and metformin.  Avandamet was made of a small amount of rosiglitazone and a large amount of metformin (e.g. one strength of Avandamet was 1 mg of rosiglitazone and 500 mg of metformin, known as the "1/500 mg" strength).

61.     To properly manufacture Avandamet, a homogenous blend of rosiglitazone and metformin was required to ensure all tablets were comprised of the proper blend of the two substances, referred to as "content uniformity."  To achieve content uniformity, the rosiglitazone and the metformin were subjected to a granulation process (much like sifting flour to make a cake).  Cidra used a wet granulation process that involved adding liquid solution to the powders to achieve the correct density so that a homogenous blend of the two drug substances could be obtained.

62.     Commercial production of the 1/500 mg, 2/500 mg and 4/500 mg strengths of Avandamet commenced at Cidra in October 2002.  Avandamet was manufactured, in part, in granulation areas known as the Niro 200 suite and the Niro 300 suite at Cidra.

63.     In the first few months of production, certain batches of Avandamet failed content uniformity tests.  A failed content uniformity test related to rosiglitazone meant that the batch was out-of-specification ("OOS") and contained sub-potent or super-potent tablets.

64.     In or about February 2003, one of the GSK GQA auditors commented in connection with a proposed internal mock pre-approval inspection for production of the 2/1000 and 4/1000 mg strengths of Avandamet that "there are many investigations now for content of the 1/500 mg tablet."

65.     In or about April 2003, GSK GQA performed the mock pre-approval inspection for the 2/1000 and 4/1000 mg tablets and observed one "Priority 1" finding, which was a finding that "may result in the regulatory agency not having sufficient confidence in process/facility/quality systems/people to allow them to approve the facility as a manufacturer." The Priority 1 finding was "[t]he Niro Fluid Bed Dryer malfunctioned allowing inconsistent drying of the granulation used in Avandamet 1-gram qualification batch, commercial Avandamet 500 mg tablets and commercial Avandia tablets."

66.     In or about November 2003, **SB PHARMCO's** sister site in Aranda, Spain complained of defects in tablets received from Cidra, including out-of-specification [i.e. content uniformity failures] tablets.

19

67.    From in or about October 2003 to December 2003, the FDA conducted an

inspection of Cidra, and issued Form 483 findings to **SB PHARMCO** that observed the

following deficiencies, among others:

a.    *Failure to question process*. "The following investigations related to OOS (assay/content uniformity and/or dissolution) obtained for Avandamet have not been questioned in terms of the adequacy of the process for Avandamet tablets . . ."

b.    *Failure to take corrective action:* "Failure to take appropriate action against all lots that may be affected by a conclusion included as the assignable cause of a failing result . . . .  Although your conclusion assigns as the most probable cause the use of common Rosiglitazone concentrate . . . not all lots using this same granulation concentration were rejected . . . .  Furthermore, no action has been taken against any batch that may have been released to the market for distribution."

c.    *Inadequate investigations:* "Your 2003 OOS manufacturing investigations related to assay, content uniformity and/or dissolution OOS, obtained for batches of Avandamet . . . are inadequate in that none of these investigations have questioned the adequacy of the process validation used to determine that your manufacturing process is robust and reproducible. Furthermore, your investigations related to these and other failures are not completed in a timely manner . . . ."

68.    The FDA conducted another inspection of Cidra from on or about September 7,

2004 through November 15, 2004, and observed continuing deficiencies regarding the

Avandamet manufacturing process:

Since July 2004, your firm has obtained about nine (9) out-of-specification (OOS) results in the content uniformity test for Avandamet as follows [listing lots].  As of November 5, 2004, your firm had not determined the root cause for the failures; if all the OOS results were related to each other; and how to correct the problem. . . . The impact in other lots that used the same in-process materials and obtained passing finished testing results has not been determined. . . .

Investigations of an unexplained discrepancy and a failure of a batch or any of its components to meet any of its specifications did not extend to other batches of the same drug product.  Specifically, lot #323-4A67 was recommended for rejection on 9/28/04 due to OOS results for content uniformity test for the Rosiglitazone

20

active ingredient.  At the closing of the investigation, your firm had not
determined the assignable cause for the failure.  Twenty seven (27) other lots of
Avandamet were manufactured using one or more of this lot's granulations and
blends. . . . These lots were not included in the investigation and twenty six (26)
of them were released and distributed.  There is no assurance that the other lots
manufactured under the same manufacturing conditions of the failing lots will
have the strength, quality and purity they represent to possess.

69.     In early 2005, GSK sent above-site experts to Cidra to determine the root cause of

the content uniformity failures regarding Avandamet.  Those experts concluded that:  (a) a

humidity sensor in a Fluid Bed Dryer in the Niro 300 suite had been improperly calibrated for an

unknown amount of time, resulting in inappropriate drying times and a shift in granulation

moisture content that resulted in poor blending of the metformin; and (b) a spacer or washer had

been inserted in the milling machine in the Niro 200 suite that was used to produce rosiglitazone

granules, resulting in some over-sized granules of rosiglitazone being used in the final product.

70.     Between in or about March 2003 and October 2004, **SB PHARMCO** released

certain lots of Avandamet for distribution in interstate commerce, including in the District of

Massachusetts, that were deemed adulterated because the manufacturing processes and laboratory

testing procedures were insufficient to assure that the Avandamet was of the strength, identity,

quality and purity that Avandamet was represented to possess.

### Product Mix-Ups

71.     During 2002, eight Field Alert Reports were filed with the FDA regarding

complaints of product commingling from patients, pharmacies, and hospitals, and nine internal

investigations were initiated based on line clearance problems that raised concerns of possible

product mix-ups at Cidra.

Case ID: 110701465

72.    On or about April 2, 2003, a GSK GQA auditor summarized the compliance risks

at Cidra against QMS and informed **SB PHARMCO** and others that one of the areas of high risk

was product mix-ups and commingling of product.

73.    On or about December 2, 2003, the FDA informed **SB PHARMCO** in Form 483

observations:

> Your firm fails to have appropriate procedures and controls in place to prevent
> mix-ups and/or adverse effects to product from occurring during the
> manufacturing/packaging process. Furthermore, batches are released by your
> Quality Unit for distribution although you are aware of findings of mix-ups prior
> to these batches being released to market.
>
> Product mix-up incidents have been repeatedly occurred [sic] since year 2001
> through 2003. Products mentioned in the above examples were approved and
> released for distribution. Furthermore, complaints related to product mix-ups
> have been received since year 2001-2003 (period covered during the EI).
> Nevertheless, you have informed the FDA through FARs [Field Alert Reports]
> and previous and the current inspection that all incidents are isolated and not
> related to your manufacturing operation.

74.    From in or about at least January 2004 until in or about October 2004, the Cidra

Site Director collected rogue tablets from the manufacturing areas and packaging lines, kept them

in a gowning hat in her office, and failed to alert site and above-site quality personnel.

75.    On or about November 20, 2004, the FDA informed **SB PHARMCO** in Form

483 observations that:

> Procedures for the cleaning and maintenance of equipment are deficient regarding
> inspection of the equipment for cleanliness immediately before use. Specifically,
> line clearance's procedures and controls are not appropriate to prevent mix-ups
> during the manufacturing/packaging processes. The following line clearance's
> related incidents occurred at the firm during the period of January-August 2004 in
> products that were released . . . [listing eight separate instances].
>
> About three (3) complaints related to product packaging/mix-ups have been
> received since 12/2003 that could be related to batches manufactured/packaged
> within the same period of time and/or the same area of the complaint's lots.

22

However, your firm relied on the adequacy of cleaning and line clearance's controls to conclude that it was unlikely that the situation was originated within the packaging area at GSK-Cidra.  There is no assurance that adequate controls are in place as to prevent mix-ups during your manufacturing operations . . . .

The responsibilities and procedures applicable to the quality control unit are not fully followed.  Specifically, your Quality Unit failed to conduct a thorough investigation of all the events associated with line clearance to prevent mix-ups during the manufacturing/packaging process according to your written procedures. . . . [citing two examples in 10/2004].

76.     In or about August 2003, **SB PHARMCO** released Lot 161-3P07 of Paxil CR which contained commingled dosages of Paxil CR for distribution in interstate commerce, including in the District of Massachusetts, which was adulterated because the manufacturing and packing processes were insufficient to assure that the Paxil CR was of the strength, identity, quality and purity that it was represented to possess.

23

## COUNT 1

**(21 U.S.C. §§ 331(a), 333(a)(2), 351(a)(2)(B) - Interstate Shipment of Adulterated Drugs)**

77.     The allegations of paragraphs 1 through 76 are realleged and incorporated herein by reference.

78.     Between in or about March 2003 and in or about October 2004, in the District of Massachusetts and elsewhere,

### SB PHARMCO PUERTO RICO, INC.

defendant herein, did, with intent to defraud and mislead, cause to be introduced and delivered for introduction into interstate commerce quantities of drugs – to wit Kytril, Bactroban, Paxil CR and Avandamet – that were adulterated in that the methods used in, and the controls used for, drug manufacturing, processing, packing and holding did not conform to and were not operated and administered in conformity with current good manufacturing practices.

All in violation of Title 21, United States Code, Sections 331(a), 333(a)(2) and 351(a)(2)(B).

24

Case ID: 110701465

## FORFEITURE ALLEGATIONS

1.      Upon conviction of a violation of Title 21, United States Code, Section 331(a),

### SB PHARMCO PUERTO RICO, INC.

shall forfeit to the United States pursuant to Title 21, United States Code, Section 334 and Title 28, United States Code, Section 2461(c) any quantities of Paxil CR, Avandamet, Kytril and Bactroban which were introduced into interstate commerce in violation of Title 21, United States Code, Section 331 and/or 351(a)(2)(b);

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   (a)      cannot be located upon the exercise of due diligence;

   (b)      has been transferred or sold to, or deposited with, a third party;

   (c)      has been placed beyond the jurisdiction of the Court;

   (d)      has been substantially diminished in value; or

   (e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 21, United States Code, Sections 334 and 853 and Title 28, United States Code, Section 2461(c), and Rule 32.2 of the Federal Rules of Criminal Procedure.

25

Case ID: 110701465

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

TONY WEST
ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION
U.S. DEPARTMENT OF JUSTICE

By: ████████████████████████

SUSAN G. WINKLER
SHANNON T. KELLEY
ASSISTANT U.S. ATTORNEYS

████████████████████████

MARK L. JOSEPHS
TRIAL ATTORNEY
OFFICE OF CONSUMER LITIGATION

26

Case ID: 110701465

# EXHIBIT B

Case ID: 110701465

Exhibit B

Examples of Drugs and Interstate Payments Fraudulently Induced by GSK

Case ID: 110701465

| Drug | NDC Number | Insurer (Headquarters) | Service/Fill Date | Paid Date | Amount Paid | Pharmacy No. | Pharmacy State |
|---|---|---|---|---|---|---|---|
| Albenza Tablet 200MG | 00007550040 | Aetna (CT) | 1/22/1997 | 1/26/1997 | $33.16 | 1505556 | IN |
| Albenza Tablet 200MG | 00007550040 | BCBSFL (FL) | 6/13/2002 | 7/2/2002 | $71.67 | 1135688 | GA |
| Albenza Tablet 200MG | 00007550040 | Healthnow (NY) | 9/8/2004 | 9/17/2004 | $12.75 | 2421509 | MN |
| Avandamet Oral Tablet 2-500 MG | 00007316718 | Priority Health (MI) | 12/6/2002 | 12/6/2002 | $33.03 | 1568485126 | PA |
| Avandamet Oral Tablet 2-500 MG | 00007316718 | GEHA (MO) | 10/3/2003 | 10/23/2003 | $91.03 | 1037236 | FL |
| Avandamet Oral Tablet 2-500 MG | 00007316718 | CIGNA (CT) | 1/1/2005 | 1/15/2005 | $170.56 | 3118165 | NJ |
| Avandia Oral Tablet 8 MG | 00029316013 | KPS (WA) | 8/27/1999 | 8/27/1999 | $107.08 | 4427894 | TN |
| Avandia Oral Tablet 8 MG | 00029316013 | Horizon BCBS (NJ) | 10/21/2002 | n/a* | $132.93 | 3319577 | NY |
| Avandia Oral Tablet 8 MG | 00029316013 | MMOH (OH) | 1/1/2005 | 10/14/2005 | $93.71 | 9999349 | NJ |
| Bactroban External Cream 2% | 00029152725 | Priority Health (MI) | 1/24/1998 | 1/30/1998 | $32.53 | 1619982725 | IL |
| Bactroban External Cream 2% | 00029152725 | Aetna (CT) | 10/29/2003 | 11/2/2003 | $78.38 | 4515207 | TX |
| Bactroban External Cream 2% | 00029152725 | Health Net (CA) | 1/1/2005 | 1/3/2005 | $53.12 | 0717251 | CT |
| Compazine Tablets 10 MG | 00007336720 | MMOH (OH) | 1/22/1997 | 2/13/1997 | $137.08 | 0000019 | MN |
| Compazine Spansule 15 MG | 00007334615 | Aetna (CT) | 5/15/2000 | 5/21/2000 | $45.19 | 1467213 | IL |
| Compazine Spansule 10 MG | 00007334415 | Health Net (CA) | 10/31/2003 | 10/31/2003 | $50.16 | 4923290 | WA |
| Coreg Oral Tablet 25 MG | 00007414220 | BCBSMT (MT) | 8/18/1999 | 8/18/1999 | $66.51 | 589804 | CA |
| Coreg Oral Tablet 25 MG | 00007414220 | AvMed (FL) | 10/2/2003 | 10/15/2003 | $75.95 | 3660203 | OH |
| Coreg Oral Tablet 25 MG | 00007414220 | GEHA (MO) | 1/1/2005 | 1/27/2005 | $213.80 | 2905632 | NV |
| Denavir Cream 1% | 00135031552 | CIGNA (CT) | 6/22/1999 | 4/29/2000 | $18.42 | 1083904 | FL |
| Denavir Cream 1% | 00135031551 | BCBSFL (FL) | 2/4/2002 | 5/15/2002 | $15.34 | 3365625 | NY |
| Denavir Cream 1% | 00135031551 | CareFirst (MD) | 5/22/2002 | 6/1/2002 | $16.47 | 3716959 | OK |
| Dibenzyline Capsule 10 MG | 00007353320 | CIGNA (CT) | 11/28/1999 | 11/30/1999 | $156.59 | 2223775 | MA |
| Dibenzyline Oral Capsule 10 MG | 65197000101 | BCBS Assn (IL) | 8/24/2001 | 9/11/2001 | $1,252.27 | 1063318 | FL |
| Dibenzyline Oral Capsule 10 MG | 65197000101 | CareFirst (MD) | 6/12/2002 | 6/15/2002 | $615.92 | 3970452 | PA |
| Dyazide Oral Capsule 37.5-25 MG | 00007365022 | MMOH (OH) | 1/2/1997 | 2/9/1997 | $13.78 | 0000019 | MN |
| Dyazide Oral Capsule 37.5-25 MG | 00007365022 | CIGNA (CT) | 7/8/2002 | 7/15/2002 | $37.32 | 430496 | SD |
| Dyazide Oral Capsule 37.5-25 MG | 00007365030 | Priority Health (MI) | 12/15/2004 | 12/20/2004 | $21.91 | 1740295922 | IL |
| Dyrenium Caps 50 MG | 00108380620 | Priority Health (MI) | 12/6/1999 | 12/10/1999 | $21.14 | 1255346367 | IL |
| Dyrenium Capsule 100MG | 65197000301 | Healthnow (NY) | 5/8/2000 | 5/19/2000 | $167.88 | 1437880 | IL |
| Dyrenium Capsule 100MG | 65197000301 | MMOH (OH) | 10/25/2002 | 11/1/2002 | $92.30 | 2349012 | MI |
| Factive Oral Tablet 320 MG | 67707032007 | CareFirst (MD) | 12/6/2004 | 12/30/2004 | $98.15 | 4837968 | VA |
| Factive Tablet 320 MG | 67707032005 | CIGNA (CT) | 12/30/2004 | 12/31/2004 | $118.28 | 1058254 | FL |
| Factive Tablet 320 MG | 67707032005 | Aetna (CT) | 1/1/2005 | 1/9/2005 | $98.46 | 1047958 | FL |

1

Case ID: 110701465

Exhibit B

## Examples of Drugs and Interstate Payments Fraudulently Induced by GSK

| Drug | NDC Number | Insurer (Headquarters) | Service/Fill Date | Paid Date | Amount Paid | Pharmacy No. | Pharmacy State |
|---|---|---|---|---|---|---|---|
| Kytril Intravenous Solution 4 MG/4ML | 00004024009 | Health Net (CA) | 12/7/2001 | 12/9/2001 | $3,262.88 | 3312838 | NY |
| Kytril 1 MG/ML Vial | 00004023909 | CIGNA (CT) | 12/20/2001 | 1/31/2002 | $144.93 | 3340368 | NY |
| Kytril Intravenous Solution 4 MG/4ML | 00004024009 | BCBS Assn (IL) | 6/20/2003 | 7/15/2003 | $1,672.57 | 1063318 | FL |
| Paxil Oral Tablet 30 MG | 00029321213 | KPS (WA) | 7/20/1997 | 7/20/1997 | $35.05 | 0000240 | CA |
| Paxil Oral Tablet 30 MG | 00029321213 | AvMed (FL) | 3/29/2003 | 3/31/2003 | $58.65 | 1149992 | GA |
| Paxil Oral Tablet 30 MG | 00029321213 | BCBSTN (TN) | 12/19/2004 | 1/7/2005 | $47.82 | 3102453 | NJ |
| Paxil Oral Suspension 10 MG/5ML | 00029321548 | Priority Health (MI) | 7/21/1998 | 7/24/1998 | $82.21 | 1255346367 | IL |
| Paxil Oral Suspension 10 MG/5ML | 00029321548 | BCBS Assn (IL) | 9/4/2001 | 9/25/2001 | $158.59 | 1063318 | FL |
| Paxil Oral Suspension 10 MG/5ML | 00029321548 | BCIdaho (ID) | 8/17/2004 | 8/27/2004 | $47.51 | 2704977 | MT |
| Relafen Tablet 750 MG | 00029485220 | BCBSTN (TN) | 11/21/1998 | 10/9/1999 | $78.53 | 3100726 | NJ |
| Relafen Tablet 500 MG | 00029485120 | BCBSRI (RI) | 1/11/2002 | n/a* | $59.01 | 1529239 | IN |
| Relafen Tablet 500 MG | 00029485120 | CareFirst (MD) | 12/29/2004 | 1/5/2005 | $107.98 | 3632545 | OH |
| Stelazine Tablet 5 MG | 00108490620 | Healthnow (NY) | 1/15/2002 | 1/25/2002 | $92.37 | 0700066 | CT |
| Stelazine Tablet 5 MG | 00108490620 | BCBS Assn (IL) | 9/3/2002 | 9/24/2002 | $254.25 | 1063318 | FL |
| Stelazine Tablet 5 MG | 00108490620 | GEHA (MO) | 9/10/2003 | 9/25/2003 | $10.07 | 1717430 | KS |
| Thorazine 10 MG/5ml Syrup | 00007507244 | CIGNA (CT) | 1/25/2002 | 1/31/2002 | $21.32 | 3631529 | OH |
| Thorazine Tablet 100 MG | 00007507720 | Aetna (CT) | 12/28/2002 | 1/5/2003 | $370.92 | 3207924 | NM |
| Thorazine 25MG/mL in 10mL Multi-Dose Vials | 00007506201 | GEHA (MO) | 11/6/2003 | 12/4/2003 | $158.17 | 2905632 | NV |

* not presently available

2