```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

    * * * * * * * * * * * * * * *
 3  UNITED STATES OF AMERICA      *
                                  *
 4             vs.                *        CRIMINAL ACTION
                                  *        No. 10-10355-JLT-1
 5  SB PHARMCO PUERTO RICO,       *
    INC.                          *
 6                                *
    * * * * * * * * * * * * * * *
 7

                 BEFORE THE HONORABLE JOSEPH L. TAURO
 8                   UNITED STATES DISTRICT JUDGE
                 WAIVER, PLEA AND SENTENCING HEARING
 9

    A P P E A R A N C E S
10

            OFFICE OF THE UNITED STATES ATTORNEY
11          1 Courthouse Way,Suite 9200
            Boston, Massachusetts 02210
12          for the United States
            By:  Susan G. Winkler, AUSA
13               Shannon T. Kelley, AUSA
                 Mark L. Josephs, Trial Attorney
14
            COVINGTON & BURLING
15          1201 Pennsylvania Avenue NW
            Washington, D.C. 20004-2401
16          for the defendant
            By:  Geoffrey E. Hobart, Esq.
17               Matthew J. O'Connor, Esq.

18
                                    Courtroom No. 22
19                                  John J. Moakley Courthouse
                                    1 Courthouse Way
20                                  Boston, Massachusetts 02210
                                    November 8, 2010
21                                  2:20 p.m.

22
                      CAROL LYNN SCOTT, CSR, RMR
23                       Official Court Reporter
                     One Courthouse Way, Suite 7204
24                     Boston, Massachusetts 02210
                            (617) 330-1377
25
```

1                          **I N D E X**

2

3                        **E X H I B I T S**

4

5

6    **COURT:**                              **FOR ID.**

7

8        No. 1    Trustee Authorization              3

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2            **THE CLERK:**  All rise for the Honorable Court.

3            **THE COURT:**  Good afternoon, everybody.

4            **THE CLERK:**  This is criminal matter No. 10-10355,

5    United States of America versus SB Pharmco Puerto Rico, Inc.

6            Counsel please identify themselves for the record.

7            **MS. WINKLER:**  Susan Winkler for the government

8    along with Shannon Kelley, a U.S. Assistant Attorney, and

9    Mark Josephs with the Office of Consumer Lit. at the

10   Department of Justice.

11           **THE COURT:**  Okay.  Nice to see you.

12           **MR. HOBART:**  Geoffrey Hobart and Matthew O'Connor

13   for the defendant, Your Honor.

14           **THE COURT:**  Okay.  Sit down, everybody.

15           I have the trustee authorization for Mr. Hobart to

16   represent the corporation in this proceeding.

17           **MR. HOBART:**  That's correct, Your Honor.

18           **THE COURT:**  All right.  We will mark this Court

19   Exhibit 1 for the purpose of this occasion.

20           **(Court Exhibit No. 1 received in evidence.)**

21           **THE COURT:**  Mr. Hobart, I am talking to you now in

22   your representative capacity.  I have two matters before me.

23   One is the waiver of indictment and the plea to an

24   information.

25           Dealing first with the waiver of indictment, I am

1   going to go over a number of matters that I know are

2   familiar to you but nonetheless need to be said.  You

3   represent the company and have been given authority to plead

4   its case before me this afternoon.

5         And I am going to remind you of the obvious and

6   that is that the charges that are pending against your

7   client, against you representing your client as well, the

8   charges are felonies.  They are serious crimes and,

9   therefore, they permit you to require the government to

10  first proceed against you and against the company by way of

11  grand jury presentment and require the government to

12  convince the grand jury by a majority vote, at least 12 to

13  11, that there is probable cause to believe that certain

14  criminal activity which is the subject of this proceeding

15  today was committed by your client.

16        Do you understand that?

17        **MR. HOBART:**  I do, Your Honor.

18        **THE COURT:**  And without laboring the point, I want

19  to make sure that you understand that the grand jury

20  process, although superficially is an accusatory one, it is

21  a very valuable one in terms of shielding innocent people

22  and companies and all from unwarranted accusation.

23        And so I want you to appreciate that it may be that

24  after presentment of evidence to the grand jury the grand

25  jury would decide that there was not probable cause to

1    believe that the criminal activity involving your client

2    should go forward and that there would be a no plea and the

3    result of that, at least for the time being, would be that

4    nothing would happen and the case would be, at least

5    temporarily, over.

6             Do you understand that?

7             **MR. HOBART:**  I do, Your Honor.

8             **THE COURT:**  The other side of that is as long as

9    you understand that you have this constitutional right to

10   require the government to proceed against you by way of

11   indictment and you are satisfied with the information that

12   has been presented to you and that you feel that you are

13   capable of making a knowing waiver of that right, you have

14   the right, like anything else, to give up the right.  And so

15   I am asking you is it your intention to waive indictment

16   here today?

17            **MR. HOBART:**  It is, Your Honor.

18            **THE COURT:**  All right.  I will approve the waiver.

19            Now, you are going to plead guilty to Count 1,

20   interstate shipment of adulterated drugs.

21            Do you understand that?

22            **MR. HOBART:**  Yes.

23            **THE COURT:**  And the penalties that you face if you

24   do this you -- when I say "you," I mean your company and

25   you -- you face the following maximum penalties on Count 1

1    of the information.  And you tell me if this is not your

2    understanding:

3              A fine of $500,000 or twice the gross gain derived

4    from the offense or twice the gross loss to a person other

5    than the defendant, whichever is greatest, and given SB

6    Pharmco's gross gain from the sales of Paxil CR, Avandamet,

7    Kytril and Bactroban that were deemed adulterated between

8    March 2003 and October 2004, they total $98,834,224, the

9    maximum possible fine in connection with this count is

10   $197,668,448.

11             Do you understand that?

12        **MR. HOBART:**  We do, Your Honor, and I agree that

13   that is the maximum fine.

14        **THE COURT:**  You agree with that number?

15        **MR. HOBART:**  Yes.

16        **THE COURT:**  All right.  And a term -- going down

17   the -- continuing with the penalties that your client faces,

18   a term of probation of not more than five years.

19             Do you understand that?

20        **MR. HOBART:**  Yes, Your Honor.

21        **THE COURT:**  Restitution to any victims of the

22   offense; do you understand that?

23        **MR. HOBART:**  Yes.

24        **THE COURT:**  A mandatory special assessment of $400;

25   do you understand that?

1          **MR. HOBART:**  Yes.

2          **THE COURT:**  And my understanding is that the United

3     States and SB Pharmco agree pursuant to Federal Criminal

4     Procedure that the appropriate disposition in this case is

5     as follows, and will result in imposition of a reasonable

6     sentence that is sufficient but not greater than necessary

7     taking into consideration all of the factors set forth in

8     federal law.

9          A, the criminal fine of $140,000,000 to be paid

10    within one week of the date of sentencing.

11          Do you understand that?

12          **MR. HOBART:**  Yes.

13          **THE COURT:**  B, mandatory special assessment

14    totaling $400.

15          Do you understand that?

16          **MR. HOBART:**  Yes.

17          **THE COURT:**  C, criminal forfeiture in the amount of

18    $10,000,000.

19          Do you understand that?

20          **MR. HOBART:**  Yes, I do, Your Honor.

21          **THE COURT:**  As far as restitution, I find that full

22    restitution has been made.  The Federal Health Care Program

23    is part of the accompanying civil settlement of $600,000,000

24    plus interest.

25          Do you understand that?

1          **MR. HOBART:**  Yes, and agree, Your Honor.

2          **THE COURT:**  And you agree with that?

3          **MR. HOBART:**  Yes.

4          **THE COURT:**  And with regard to the nonfederal

5    victims I find that the complication and prolongation of the

6    sentencing process that would result from an attempt to

7    fashion a proper restitution order outweighs the need for

8    such a restitution order because numerous unknown

9    individuals and insurance companies purchased or were

10   reimbursed for the drug products and tracing reimbursements

11   and determining apportionment of the payment would be

12   difficult, if not impossible.

13          Do you understand that?

14          **MR. HOBART:**  Yes, Your Honor.

15          **THE COURT:**  And do you have any objection to my

16   finding?

17          **MR. HOBART:**  No, we agree with that finding, Your

18   Honor.

19          **THE COURT:**  All right.  Anything else that I should

20   take up now?

21          I don't think we have taken his plea yet so --

22          **MS. WINKLER:**  No, you haven't.

23          **THE COURT:**  Why don't you take the plea, Zita.

24          **THE CLERK:**  Yes, Judge.

25          Mr. Hobart, as the appointed and designated

1    trustee, as to Count 1 of this Information charging you with

2    21 United States Code, Sections 331(a), 333(a)(2) and

3    351(a)(2)(B), charging you with interstate shipment of

4    adulterated drugs, how do you plead to Count 1?

5              **MR. HOBART:**  As the authorized representative of SB

6    Pharmco Puerto Rico, Inc. we plead guilty.

7              **THE CLERK:**  Thank you.

8              **THE COURT:**  Any other comments anybody want to

9    make?

10             Let's have a basis in fact.

11             **MS. WINKLER:**  Your Honor, the following statement

12   of facts is a general summary of some of the evidence that

13   the government would present at trial in this case with

14   regard to the charge presented against SB Pharmco.

15             SB Pharmco was a Puerto Rican corporation located

16   in Cidra, Puerto Rico.  It owned and operated a

17   manufacturing facility there and it was an indirect

18   subsidiary of GlaxoSmithKline, a publicly traded company.

19             The evidence at trial would demonstrate that from

20   in or about March 2003 to October 2004, in Massachusetts and

21   elsewhere, SB Pharmco did, with intent to defraud and

22   mislead, cause to be introduced and delivered for

23   introduction into interstate commerce quantities of drugs,

24   to wit, Kytril, Bactroban, Paxil CR and Avandamet, that were

25   adulterated in that the methods used in and the controls

1    used for, drug manufacturing, processing, packing and

2    holding did not conform to and were not operated or

3    administered in conformity with current good manufacturing

4    practices.

5          The evidence would be that in 2001 Cidra was one of

6    the largest manufacturing facilities worldwide for GSK and

7    was a major supplier of pharmaceuticals to the U.S. market.

8          Cidra was responsible for a complex portfolio of

9    drug products, including pills, creams, ointments and

10   injectables.  The plant was old.  It had been built in the

11   1980s.  And upon acquisition of the plant GSK realized it

12   posed risks because of certain deficiencies.  Those risks

13   became more serious as time passed increasing the risk that

14   drugs might not be made in conformance with the cGMP, the

15   good manufacturing practices.  And that meant the

16   pharmaceuticals were not made in a manner that guaranteed

17   they were of the strength, identity and purity and quality

18   that they purported to represent.

19         The evidence at trial would involve five areas of

20   concern.  One is the drug Kytril which was an injectable

21   anti-nausea medication primarily used to treat patients

22   receiving chemotherapy or radiation or post-surgical

23   patients experiencing nausea.

24         As part of the merger GSK was required to have

25   Kytril divested to another drug manufacturer but GSK

1    continued to manufacture the product at the Cidra plant

2    until December 2003 when the acquiring entity got their

3    approvals from the FDA.

4          Kytril was made in the sterile suite at Cidra.  An

5    internal audit by GSK found the sterile suite did not comply

6    with expectations, that a capital expenditure was necessary

7    to improve conditions or their operation should be

8    discontinued with a sense of urgency.

9          Evidence would have shown that in April or May 2003

10   SB Pharmco released Kytril, that it was deemed adulterated

11   because the manufacturing processes and lab testing were

12   insufficient to assure the quality and purity it was

13   represented to possess.

14         Bactroban is the second area.  It was a topical

15   antibiotic used to treat skin infections.  It was also made

16   in a sterile suite.  The Quality Control Unit at Cidra

17   failed to properly review a batch in June 2001 that was

18   released to the market and not recalled until February 2002

19   during an FDA inspection of the plant.  In that inspection

20   GSK identified one of the reasons that contamination could

21   be introduced into Bactroban was a practice of manually

22   scraping inside the tanks to get the last bit of product out

23   of the tank.

24         GSK assured the FDA that the practice would stop.

25   After a new site director was appointed to Cidra a year

1      later the practice was resumed as a cost-saving measure.

2              Thereafter, in or about October 2003 SB Pharmco

3      released a lot of Bactroban where there was potentially

4      objectionable microorganisms identified on equipment that

5      manufactured the lot and that lot was deemed adulterated

6      because the manufacturing processes and lab testing were

7      insufficient to assure that the Bactroban was of the quality

8      and purity that it was purported to represent.

9              A third area was Paxil CR, a controlled release

10     form of an antidepressant that was manufactured as a

11     bi-layer tablet, an active layer that had the therapeutic

12     part and a barrier layer that had the controlled release

13     formulation.

14             Shortly after the commercial production began at

15     Cidra, the tablet was observed to split between the layers,

16     something that was known as a critical defect.

17             In early 2003 in limited instances GSK performed a

18     test and determined that the cause of the splitting was a

19     result of too high a compression force on the active layer

20     which prevented the barrier layer from adhering properly.

21     The report recommended the installation of new load cells on

22     the presses so they could accurately read the compression

23     forces.  Those load cells were not installed.

24             Until February 2004 SB Pharmco was using a visual

25     inspection to check for those splits before packaging.  At

1       that time the company switched its statistical inspection of

2       the 12.5 and 25 milligram tablets which meant that only a

3       thousand tablets out of 1.5 to two million tablets that were

4       made in the batch were ever inspected.  If no splits were

5       found in that 1,000 sample, the lot was released to the

6       market.

7               From February to September of 2004 during another

8       FDA inspection SB Pharmco used that statistical inspection

9       and it did not have adequate control over the compression

10      forces to assure that the tablets would not split.

11              Thus, during that time period lots of Paxil CR were

12      released that were deemed adulterated because the

13      manufacturing equipment was insufficient to control the

14      pressures and the process controls could not assure that the

15      Paxil CR released to market was of the strength, identity

16      and quality that it was supposed to represent.

17              The fourth area was Avandamet, a drug used to treat

18      diabetes and it consisted of a blend of two different

19      ingredients.  Shortly after commercial production began GSK

20      found content uniformity problems in some batches of the

21      Avandamet.  That means that the content was not as it was

22      supposed to be of the two different ingredients.

23              In October 2003 and again in November 2004 the FDA

24      found inadequate processes and corrective actions by SB

25      Pharmco to investigate and correct the content uniformity

1    problems with Avandamet.

2           Ultimately experts at GSK determined that the

3    humidity sensor in one of the machines was not properly

4    calibrated and a spacer or washer had been inserted in the

5    milling machine when it was installed.

6           Thus, between March 2003 and October 2004 certain

7    lots of Avandamet were released to market where the

8    manufacturing processes and lab testing procedures were

9    insufficient to assure the drug was of the strength,

10   identity and quality it was purported to possess.

11          Finally, product mix-ups were an issue at Cidra.

12   The line clearance on the packaging lines were insufficient

13   to prevent rogue tablets from getting into the wrong

14   packages.  The site directer who was in charge in 2003 and

15   2004 would collect those pills and instead of conducting

16   investigations to find out what happened put them in a

17   gowning hat in her office.

18          THE COURT:  Put them in a what?

19          MS. WINKLER:  In a gowning hat, a hat they wear to

20   protect from bacteria getting into the processes.

21          THE COURT:  I see.

22          MS. WINKLER:  Which meant there was a possibility

23   of the products being commingled into the wrong pill

24   bottles.

25          And for all these reasons and all as further set

1    forth in the information, the evidence at trial would show

2    that between March 2003 and October 2004, in Massachusetts

3    and elsewhere, SB Pharmco with intent to defraud and mislead

4    caused to be introduced and delivered for introduction into

5    interstate commerce quantities of drugs as earlier described

6    that were adulterated in violation of Title 21, U.S.C.,

7    Sections 331(a), 333(a)(2) and 351(a)(2)(B).

8              **THE COURT:**  All right.  Thank you.

9              Do you have anything you wanted to add?

10             **MR. HOBART:**  No, Your Honor, just that SB, on

11   behalf of SB Pharmco Puerto Rico, Inc., the company agrees

12   that there is a sufficient basis in the evidence to support

13   the guilty plea.

14             **THE COURT:**  All right.  Thank you.

15             I am satisfied that the defendant understands the

16   nature of the accusation against it in this count, that it

17   understands the maximum consequences of its guilty plea,

18   that it has pleaded guilty voluntarily and that there is a

19   basis in fact for it having done so.

20             I am going to impose the sentence that I referred

21   to earlier, as follows:

22             A criminal fine of $140,000,000 to be paid within

23   one week of the date of sentencing.

24             B, mandatory special assessment totaling $400.

25             C, criminal forfeiture in the amount of

1    $10,000,000.

2            And, D, I find that full restitution has been made

3    as part of the accompanying civil settlement of $600,000,000

4    which is attached hereto as an exhibit.

5            Anything else that I should cover before we --

6            **MS. WINKLER:**  Your Honor, I would just ask that

7    with regard to the restitution, the $600,000,000 is full

8    restitution for the federal programs but for the nonfederal

9    programs your earlier finding that it would unduly

10   complicate and prolong the sentencing process --

11           **THE COURT:**  I did say that.  I will add that now,

12   just to make it clear.

13           With regard to the -- the $600,000,000 was for the

14   federal restitution.  With regard to the nonfederal victims,

15   I find that the complication and prolongation of the

16   sentencing process that would result in such an attempt to

17   fashion a proper restitution order outweighs the need for

18   such a restitution order because numerous unknown

19   individuals and insurance companies purchased or were

20   reimbursed for the drug products and tracing reimbursements

21   and determining apportionment of payment would be difficult,

22   if not impossible.

23           Is that satisfactory?

24           **MS. WINKLER:**  Yes, Your Honor.

25           And one other thing.

1        **THE COURT:**  Go ahead.

2        **MS. WINKLER:**  There is a motion pending for order

3    of forfeiture that is assented to by the defendants.  It

4    would be appreciated if you'd allow that.

5        **THE COURT:**  I have it right here.

6        **THE CLERK:**  Yes.

7        **THE COURT:**  No objection to this motion?

8        **MR. HOBART:**  No, Your Honor.

9        **THE COURT:**  Okay.  I am allowing it.

10       And I am signing the order as well.

11       Does that cover everything?

12       (Whereupon, the Court and the Clerk conferred.)

13       **THE COURT:**  We are making one change which I think

14   you have to endorse here.

15       Zita will find the original.

16       (Pause in proceedings.)

17       **THE COURT:**  That is the trouble with having the

18   judge read all that stuff, he might find something.

19       (Laughter.)

20       **THE COURT:**  Just initial it, that will be

21   satisfactory to me.

22       **MS. WINKLER:**  Okay.

23       (Pause in proceedings while counsel initialed the

24       document.)

25       **THE COURT:**  Now, you have been sentenced and as one

1    who has been sentenced, you can appeal that sentence.  You

2    have ten days to file a notice of appeal if it is your

3    intention to do so.

4            Do you understand that?

5            **MR. HOBART:**  I do, Your Honor.  And the company in

6    the plea agreement waived that right.

7            **THE COURT:**  All right.  I just want to make sure

8    you are well aware of it.

9            Anything else?

10           **MS. WINKLER:**  No, Your Honor.

11           **THE COURT:**  Anything else?

12           **MR. HOBART:**  No, Your Honor.

13           **THE COURT:**  All right.  Thank you for your

14   cooperation.  You are all dismissed.

15           **THE CLERK:**  All rise for the Honorable Court.

16

17           (WHEREUPON, the proceedings were recessed at 2:45

18           p.m.)

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Carol Lynn Scott, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.



                    /S/CAROL LYNN SCOTT


        _____

                    CAROL LYNN SCOTT
                  Official Court Reporter
                John J. Moakley Courthouse
             1 Courthouse Way, Suite 7204
              Boston, Massachusetts 02210
                    (617) 330-1377



**DATE: November 18, 2010**